REVEREND PAUL BUSSARD v. COLLEGE OF ST. THOMAS, INC., d.b.a. CATHOLIC DIGEST.

200 N. W. 2d 155.

July 28, 1972—No. 43281.

216

*James R. McClure* and *David L. Graven,* for appellant.

*Moore, Costello & Hart* and *A. Patrick Leighton,* for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and Kelly, JJ.

PETERSON, JUSTICE.

Plaintiff, the Reverend Paul Bussard, brought this action against defendant, the College of St. Thomas, seeking alternative forms of relief for breach of an alleged oral condition to a gift made under written contract, and appeals from summary

judgment in favor of defendant. Plaintiff mainly contends: First, that the trial court improperly held that the parol evidence rule would prevent him from introducing evidence of the oral condition, and, second, that he made a sufficient showing, by affidavits, documents, and deposition testimony, of the alleged oral condition to create a genuine issue of material fact. The nature of these contentions requires a factual recital of some detail.

Plaintiff, along with two other Catholic clergymen, Reverend Louis A. Gales and a Reverend Jennings, founded the Catholic Digest Magazine (hereafter Digest) in 1936 as a private profit-making corporation. From the outset, plaintiff took an active role in its operation and acted as publisher and editor of the Digest. Initially plaintiff owned 25 percent of the stock; Father Jennings, 10 percent; and Father Gales, 65 percent. Plaintiff later acquired Father Jennings' interest.

In the mid-1950's Father Gales indicated to plaintiff that he would like to sell his interest and devote the proceeds to other projects in which he had a personal interest. Plaintiff and Father Gales accordingly entered into a written agreement providing that plaintiff should act for both parties in attempting to sell the Digest; and during the ensuing 8 years or so plaintiff negotiated with a number of different parties in attempting to sell the Digest. Although these negotiations were unsuccessful for lack of a satisfactory offer, the negotiating parties were always in agreement that, if the Digest were sold, the purchaser would continue plaintiff on as its publisher.

In mid-1963 plaintiff almost reached agreement with Meredith Publishing Co. of Des Moines, Iowa. A professional audit completed in July 1963 valued the Digest at $1.5 million. Meredith proposed to buy the Digest and operate it as a subsidiary corporation with plaintiff remaining as publisher. Before plaintiff and Meredith could reach a final agreement, however, they learned that plaintiff's superior, Archbishop Leo Binz, wanted the Digest to be placed on a nonprofit basis. Meredith then aban-

doned its plans to acquire the Digest and operate it as a subsidiary.

In November 1963 plaintiff wrote a letter to the Right Reverend Monsignor James P. Shannon, then president of St. Thomas, suggesting the possibility of the college owning the Digest, and a month later, through his agent, suggested to Archbishop Binz a plan whereby Meredith would purchase the Digest stock and donate it to St. Thomas in return for St. Thomas granting the Digest printing contract to Meredith.

On January 6 and 7, 1964, plaintiff met with lawyers for Meredith to discuss ways of effecting the transition of the Digest from a profit to a nonprofit corporation. As a result of these discussions plaintiff agreed to submit a detailed proposal to Meredith. He proposed that Meredith would agree to finance the transfer of the Digest stock to St. Thomas, which would operate the Digest on a nonprofit basis, and that St. Thomas would agree to a 15-year printing contract with Meredith and, in addition, would agree to retain plaintiff as publisher, in charge of all editing and management of the Digest for the same 15-year period.

On January 21, 1964, the Right Reverend Monsignor Patrick J. Ryan, who acted as plaintiff's agent, met with Archbishop Binz, Monsignor Shannon, and the Right Reverend Monsignor Terrence J. Murphy. At this meeting the Archbishop indicated that any final plan would have to meet with his personal approval as well as that of the Board of Trustees of the College of St. Thomas. Monsignor Ryan indicated to the Archbishop that the printing contract with Meredith would continue only until St. Thomas had repaid a contemplated loan of $1 million from Meredith for the purchase of the Digest stock. He indicated that plaintiff and probably Father Gales would be willing to donate to the college that portion of their Digest stock which exceeded the amount of that loan, so that the printing contract to Meredith would be of shorter duration than the previously proposed 15-year period. A memorandum which Monsignor Ryan prepared following the meeting stated:

"The Archbishop paid high compliment to Father Bussard because of his dedication to the work of the Catholic Digest and for his abiding interest in the College of St. Thomas. He also pointed out Father Bussard's demonstrated ability and experience as a publisher and indicated that in his judgment the College of St. Thomas would require the services of Father Bussard in the capacity of the publisher for several years to assure the continued excellence of the magazine. Monsignor Shannon indicated his complete agreement with this statement and Monsignor Ryan assured the group that such an arrangement would meet with the approval of Father Bussard. His Excellency also raised certain questions as to what staff members are protected in their jobs."

The parties concluded the meeting with an understanding that the Digest owners would continue to negotiate with Meredith to clarify several elements of the proposal and that the Archbishop would discuss with Father Gales a reduction in his share of the Meredith loan in the same proportion as plaintiff would reduce his share. Upon receiving this memorandum, plaintiff reviewed it and raised no objection concerning it.

In March 1964 plaintiff, Monsignor Shannon, representatives of Meredith, and several others met to discuss the proposal in detail, and all parties present accepted plaintiff's condition that he remain as publisher for the full term of the Meredith loan. The transaction was never completed, due to a disagreement between St. Thomas and Meredith over an issue of whether certain Digest-owned real estate would be used as security for the contemplated loan.

Thereafter, plaintiff conducted negotiations directly with St. Thomas which resulted in an agreement, dated May 30, 1964, whereby plaintiff agreed to give part of his stock, valued at $350,000, to the college as part of an arrangement whereby the college agreed to purchase the balance of plaintiff's stock for $175,000 with interest to be paid over a 10-year period.

Plaintiff contends that in negotiations leading up to the May 30, 1964, agreement, defendant college orally assented to a stipulation that the gift would be conditioned upon plaintiff's remaining as publisher of the Digest.

At his deposition plaintiff in these words acknowledged that he had never in his oral negotiations with the college itself explicitly stated that his gift was to be conditioned upon his continuing as publisher:

"Q.  * * *  As I understand it these conversations relative to your continuing as publisher were never discussed in terms of I am making this transfer based upon your assurances that I can stay as publisher?

"A.   Except they were—except for this, that there was always a negative unexpressed thing in my mind that if I would have been discontinued as publisher I would not have made the transfer. Under any other conditions I would have done anything except to transfer the company to the college or to any other company and not remain—not have my authority as publisher remain because I knew how to do it and they didn't.

"Q.   This is something that existed in your own mind, Father?

"A.   Yes. This is something in my own mind, it is an unexpressed negative argument but it is as true today as it was then."

The inexplicit character of his answer to this vital point was explained by plaintiff in his further testimony that he had seen no reason to do otherwise since "everyone assured me without my asking that I would be continued as publisher" and "always I got the big promise that I would be so I had no reason to express it." Testimony of others tended to confirm that explanation.

On May 21, 1964, Monsignor Shannon presented the proposed acquisition to the college's board of trustees for approval. A summary of his remarks to the board included this statement: "The publisher of the Catholic Digest is the Reverend Paul Bussard.

It is expected that he will continue in that position if the Digest corporations are acquired by the College."

On May 25, 1964, Monsignor Shannon, summarizing the board proceedings in a letter to plaintiff, stated in part:

"In my letter to the Archbishop recommending this transfer I stated that it would be necessary for the successful operation of the Digest enterprises that you, Father Kenneth Ryan and Monsignor Patrick Ryan remain with the *Digest*. In my presentation to the Board of Consultors and the Board of Trustees your continuance as publisher was stressed. There was ready agreement to this by all parties. I am grateful for your willingness to continue with the *Digest*.

"I want also to state that the College agrees to pay you the net proceeds from the Hamline property if that property should be sold and the *Digest* moved to this campus. This arrangement of payment is an alternative to or modification of the plan stated in your contract."

The agreement providing for the transfer of assets was entered on May 30, 1964.

Mr. Walter J. Beggin, by affidavit, reported similar statements made by Monsignor Shannon at a national sales conference he attended at the Edgewater Beach Hotel in Chicago, Illinois, on August 3, 1964. According to Beggin's affidavit, Monsignor Shannon, speaking at the conference, assured those present that the management of the Digest would remain the same and that plaintiff, under the terms of the gift, would remain as publisher.

In September 1964, more than 3 months after the transfer, plaintiff received a telephone call from Payson Hall of Meredith, which was at that time negotiating for the purchase of the Book Club operated by the Digest, seeking assurances that plaintiff would continue as publisher of the Digest. Plaintiff then called Monsignor Shannon, related to him the conversation with Hall, and requested a letter of assurance which plaintiff could send

to Meredith. Monsignor Shannon sent plaintiff two letters, one in draft form and a final one dated September 23, 1964, in which Shannon stated in part:

"At the time that the College of St. Thomas acquired ownership of the *Catholic Digest* and its affiliate organizations you graciously agreed to continue in your former capacity as publisher. In fact, your continuance as publisher was a condition of the transfer of the Catholic Digest corporations to this college."

In July 1965 Howard LaPray, who was director of advertising promotion for the Digest, attended a meeting presided over by Monsignor Shannon. An affidavit by Mr. LaPray related a private discussion which he had at that meeting with Monsignor Shannon:

"* * * In the personal conference with me I was assured by Bishop Shannon that I need not worry about my job and that my services were being retained. Bishop Shannon also stated unequivocally to me at that time that Father Bussard and he (Bishop Shannon) agreed prior to the transfer of the Catholic Digest to the College of Saint Thomas that Father Bussard's generous gift to the College included the agreement between them and that Father Bussard had the right to continue to serve as publisher as long as Father Bussard was willing to serve. This was not a casual, off-hand remark but a studied statement made by Bishop Shannon in a most convincing manner."

Plaintiff did continue as publisher of the Digest following its acquisition by defendant college. During these years disagreements arose between plaintiff and defendant over the operation of the Digest. Defendant hired Robert Fenton as general manager of the Digest in 1965, an action which plaintiff considered effectively removed much of his authority and violated his alleged agreement. He wrote to the Archbishop to protest this action, but he did not then state that he considered it a breach of any agreement. On May 14, 1969, Mr. Fenton advised plaintiff

by letter that plaintiff would be retired effective July 1, 1969. Plaintiff thereupon instituted his action for breach of agreement.

■ Plaintiff claims that his gift to defendant was conditioned upon a right to continue as publisher of the Digest for as long as he wished and that defendant breached that condition by discharging him without cause. In other words, plaintiff asserts a contractual right to permanent or lifetime employment as publisher of the Digest because he so conditioned his gift of stock to defendant and because defendant accepted the gift subject to this condition.

The leading Minnesota case dealing with contracts for permanent or lifetime employment is Skagerberg v. Blandin Paper Co. 197 Minn. 291, 266 N. W. 872 (1936), noted, 35 Mich. L. Rev. 321, 21 Minn. L. Rev. 748.[1] We there indicated adherence to the somewhat arbitrary rule of most jurisdictions that a contract for "permanent employment" will be construed to be terminable at the will of either party except in compelling circumstances, such as where the employee in effect purchases the permanent employment by giving a valuable consideration other than his customary daily services or otherwise giving up more than one normally gives up when he agrees to take on a new employment. The rule is arguably too mechanical an answer to the more basic issue of ascertaining the real intent of the parties, 22 Minn. L. Rev. 731, but no reexamination of the rule is necessary in this case. This plaintiff clearly did furnish the valuable consideration contemplated by the existing rule. We must instead turn to

---

[1] Other Minnesota cases include: Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 117 N. W. 2d 213 (1962); Degen v. Investors Diversified Services, Inc. 260 Minn. 424, 110 N. W. 2d 863 (1961); Smith v. St. Paul & Duluth Ry. Co. 60 Minn. 330, 62 N. W. 392 (1895); Bolles v. Sachs, 37 Minn. 315, 33 N. W. 862 (1887). Federal cases applying Minnesota law include: Albers v. Wilson & Co. 184 F. Supp. 812 (D. C. Minn. 1960); Maple Island Farm, Inc. v. Bitterling, 209 F. 2d 867 (8 Cir. 1954). The cases are annotated at 35 A. L. R. 1432, supplemented at 135 A. L. R. 646. For additional law review commentary, see, 15 N. C. L. Rev. 276; 1 Md. L. Rev. 73.

the question of whether either the statute of frauds or the parol evidence rule would bar plaintiff's effort to prove an oral agreement of such continued employment.

■ The statute of frauds is clearly not an impediment to plaintiff's proof of an oral agreement. A contract of permanent employment is "performable within a year" because of the possibility of death within a year. Numerous cases, collected in Annotations, 35 A. L. R. 1432, 1440, and 135 A. L. R. 646, 688, so hold. And see, Restatement, Contracts, § 198, *Illustration* 2; Restatement, Agency 2d, § 414, Comment *a*.

■ The parol evidence rule presents a more difficult hurdle. We conclude, however, that in the unique situation of these contracting parties, plaintiff should have the benefit of the "incomplete contract" exception to the parol evidence rule. That exception to the parol evidence rule was stated by Mr. Justice Mitchell in Phoenix Publishing Co. v. Riverside Clothing Co. 54 Minn. 205, 206, 55 N. W. 912 (1893) :

"The rule forbidding the use of parol evidence to affect a written instrument does not apply to a case where a part only of the dealings between the parties in respect to a particular subject matter is reduced to writing, except as respects such part. It is always competent to prove by parol the existence of any separate oral agreement as to any matter on which the document is silent, and which is not inconsistent with its terms, if, from the circumstances of the case, the court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them."

A determination of whether the written document is a complete and accurate "integration" of the terms of the contract is not made solely by an inspection of the writing itself, important as that is, for the writing must be read in light of the situation of the parties, the subject matter and purposes of the transaction, and like attendant circumstances. Jimmerson v. Troy Seed Co. 236 Minn. 395, 53 N. W. 2d 273 (1952); Bjornstad v. North-

ern States Power Co. 195 Minn. 439, 263 N. W. 289 (1935); Cargill Commission Co. v. Swartwood, 159 Minn. 1, 198 N. W. 536 (1924); Wheaton Roller-Mill Co. v. John T. Noye Mfg. Co. 66 Minn. 156, 68 N. W. 854 (1896). It is a common-sense reading. As we indicated in Taylor v. More, 195 Minn. 448, 263 N. W. 537 (1935), if the alleged oral agreement is one that parties similarly situated would embody in the written agreement, then the written document is "complete." [2]

Reading the written agreement dated May 30, 1964, in light of all the attendant circumstances, including the situation of the parties and the subject matter and purposes of the transaction (as these circumstances appear in the limited context of a motion for summary judgment), we have determined that the trial court erred in concluding that the parol evidence rule stood as a bar to proof of the alleged oral agreement or condition.

The unique circumstance of this case is that it was not the ordinary, arm's length transaction. It is instinct with the eccle-

---

[2] Restatement, Contracts 2d, Tentative Draft No. 5 (1970), § 242, *Comment d,* contains this statement relevant to the unique facts of the case at bar: "If it is claimed that a consistent additional term was omitted from an integrated agreement and the omission seems natural in the circumstances, it is not necessary to consider further the questions whether the agreement is completely integrated and whether the omitted term is within its scope, although factual questions may remain. This situation is especially likely to arise when the writing is in a standardized form which does not lend itself to the insertion of additional terms. Thus agreements collateral to a negotiable instrument if written on the instrument might destroy its negotiability or otherwise make it less acceptable to third parties; the instrument may not have space for the additional term. Leases and conveyances are also often in a standard form which leads naturally to the omission of terms which are not standard. These examples are not exclusive. Moreover, there is no rule or policy penalizing a party merely because his mode of agreement does not seem natural to others. Even though the omission does not seem natural, evidence of the consistent additional terms is admissible unless the court finds that the writing was intended as a complete and exclusive statement of the terms of the agreement. See § 236."

siastical relationship of the parties. This, of course, implies no criticism and simply warrants a less critical reading of the resulting contract; for were it otherwise, we could well conclude that the alleged oral agreement is one that parties otherwise similarly situated would embody in the written agreement.[3] Plaintiff's ecclesiastical superior had impelled the transaction by instructing him to divest himself of ownership of the Digest. And when plaintiff, obedient to those instructions, ultimately dealt with defendant's agents, he was dealing with colleagues of the cloth, several of whom were of superior status. Nothing in the record indicates that in those dealings plaintiff was represented by legal counsel, but defendant was so represented. Plaintiff's "agent" was a priest, himself subject to church authority, and there is nothing to indicate that he, any more than plaintiff, was familiar with the parol evidence rule. We in no sense suggest that there was overreaching on the part of defendant or its agents. We suggest simply that the circumstances and relationships of the parties were such that it might have been unusual if plaintiff had even hinted to defendant's agents that the alleged promises concerning permanent employment should be guarded by express incorporation into the written agreement.

■ Since neither the statute of frauds (under any circumstances) nor the parol evidence rule (under the facts as they appear on this motion for summary judgment) stands as a bar to plaintiff's proving the alleged oral contract for permanent employment, the remaining question is whether plaintiff made a sufficient showing of such a contract or condition to ward off summary judgment. We conclude, on this second close issue, that he did.

Plaintiff's previously quoted deposition testimony that the condition to the gift was "a negative unexpressed thing," rather than an explicitly stated agreement, was not, in our view, such

---

[3] But see, Langendorf United Bakeries, Inc. v. Moore, 327 F. 2d 592 (9 Cir. 1964) (parties did not include oral contract of permanent employment of seller in written contract of sale of a bakery).

plain disavowal of a condition or agreement as would preclude him, under the "party preclusion rule," from proving the alleged oral contract of permanent employment. Cf. Peterson v. American Family Mutual Ins. Co. 280 Minn. 482, 160 N. W. 2d 541 (1968). The vagueness of plaintiff's characterization of the agreement was contemporaneously clarified by his other testimony that, in view of the assurances of "everyone" that he would be continued as publisher, the condition was implicitly understood. His deposition testimony, reinforced by the affidavits of Howard LaPray and Walter Beggin, and the September 23, 1964, letter of Monsignor Shannon, create a genuine issue of material fact entitling plaintiff to a trial on the merits.

Plaintiff did not testify that his alleged agreement for employment as publisher was for a definite period of time. The fact that the parties did not state a definite period, however, does not compel a summary determination that they did not agree that plaintiff could continue as publisher for as long as he wished. The applicable principle is stated in 3A Corbin, Contracts, § 684:

"* * * Neither party may have any definite period of service in mind; in which case it is natural for them to say nothing about it, and the employment is terminable at the will of either party. On the other hand, both of them may understand that the hiring is for a definite period. The circumstances may be evidential of such an understanding, even though the express words, standing alone, would not bear such an interpretation. Thirdly, one of the parties (usually the employee) may have had in mind a definite period of employment and the other party had not. Here there is no actual 'meeting of the minds'; and yet there may be a valid contract. Interpreting the elliptical expressions of the parties, the court may find that the expressions, interpreted in the light of the surrounding facts, made the understanding of one of the parties reasonable and make it unreasonable for the other party not to know that such would be the first party's

understanding. In such a case, there is a contract in accordance with that understanding. * * *

* * * * *

"The employer may be bound for a definite period, or as long as the services are satisfactory, or even as long as the employee wishes to stay. If the employee gives a sufficient consideration for the employer's promise, the lack of mutuality of obligation is immaterial."

The indefiniteness of the alleged oral agreement may well give plaintiff difficulty at trial. We simply hold that there is a material issue of fact for trial as to whether both plaintiff and defendant implicitly understood that plaintiff would continue as publisher for as long as he wished.

■ We conclude with an observation concerning the alternative forms of relief which plaintiff seeks, an issue not immediately before us. We think it clear that if plaintiff should establish as a fact that defendant agreed to employ him for as long as he wished and not to discharge him without cause, he will be entitled only to damages and not to specific performance of the agreement. See, Restatement, Agency 2d, § 442, Comment *d*.

Reversed.