James M. CORUM, Plaintiff,

v.

FARM CREDIT SERVICES, d/b/a the St. Paul Bank for Cooperatives, the Federal Land Bank of St. Paul, and the Federal Intermediate Credit Bank of St. Paul, Defendant.

No. Civ. 4–85–407.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 13, 1986.

James M. Samples, Melissa W. McClenahan, Christine O. Merriman, Faegre & Benson, Minneapolis, Minn., for plaintiff.

Thomas P. Kane, Marko J. Mrkonich, Eleanor M. Dilkes, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion for partial summary judg-

ment. Also before the Court is plaintiff's appeal from the December 5, 1985 order of the United States Magistrate. The Court will affirm the Magistrate's order and will grant defendant's summary judgment motion in all respects.

## FACTS

Plaintiff James M. Corum was formerly employed by defendant Farm Credit Services (FCS). Defendant states that FCS is the management organization for three banking institutions: the St. Paul Bank for Cooperatives (BC), the Federal Land Bank of St. Paul (FLB), and the Federal Intermediate Credit Bank of St. Paul (FICB). (The Court will refer to these three entities collectively as "the Banks.") Plaintiff responds that the FCS is not a "management organization" for the Banks, rather plaintiff maintains that the Banks have chosen to do business as the FCS. Accordingly, plaintiff has styled his action *Corum v. FCS d/b/a BC, FLB, and FICB.* The Banks are lending institutions federally chartered under the Farm Credit Act, 12 U.S.C. §§ 2001–2260. The Farm Credit Act established the Federal Credit System, and the Banks are a part of that system. The purpose of the system is to improve the income and well-being of farmers and ranchers by providing credit. *See* 12 U.S.C. § 2001(a).

In 1968, plaintiff was a trial attorney at the St. Paul law firm of Altman, Gerahty, Leonard & Mullally. Corum ¶ 2.[1] During that year, the president of the FICB, Andrew Lampen, approached plaintiff regarding legal employment at the FICB. While plaintiff was negotiating with Lampen regarding the position with FICB, Lampen repeatedly told plaintiff that plaintiff would not get rich working for the FICB, but plaintiff would have "job security" and a company car. Corum 68; ¶ 3.

When plaintiff started his employment with FICB in 1968, he was the only attorney on the staff. Plaintiff's title at this time was senior attorney, but he states he was performing the functions of a general counsel. Corum 314–15. In 1969, plaintiff's title changed to General Counsel. In 1971, the FICB added the corporate office of secretary to plaintiff's position. *See* Exh. 5, at 2.[2]

After approximately two years with the FICB, *i.e.*, sometime in 1970 or 1971, plaintiff states that he began to realize that he was becoming very specialized in his legal practice. Plaintiff adds that he was becoming concerned that his narrow expertise in farm credit law would hurt his ability to obtain other legal employment. Corum 68; ¶ 5, 6. Consequently, plaintiff raised his concerns with FICB president Lampen. Plaintiff told Lampen that in order for plaintiff to remain at FICB, he would need a higher salary and assurances for his future at FICB. Lampen responded by obtaining an eight percent salary increase for plaintiff. In addition, Lampen told plaintiff that he would have job security with the FICB; and Lampen again noted that plaintiff would not get rich working for FICB, but he would not have to worry about a job. Corum 69; ¶ 6. Plaintiff states that based on the salary increase and Lampen's assurances, he decided to make a career of farm credit law. Plaintiff's understanding of his relationship with FICB, was that he had a position there until retirement, as long as he did good work. Corum ¶ 6.

Also in the early 1970's, sometime after plaintiff receive the eight percent salary increase, the head of the Farm Credit System offered plaintiff the position of general counsel for the Farm Credit Administration in Washington, D.C. Plaintiff declined this offer because he was content with his position at FICB after having received Lampen's assurances of job security. Corum 202; ¶ 7.

Subsequently, plaintiff continued to serve as general counsel and secretary for FICB. In 1980, FICB and BC consolidated

---

**1.** A name followed by a paragraph number denotes a paragraph of an affidavit. A name followed simply by a number denotes the page of a deposition transcript.

**2.** An exhibit number refers to a deposition exhibit.

their legal functions, and plaintiff became general counsel and secretary for the combined operation. Later in 1980, plaintiff assumed the title of senior vice president and general counsel. *See* Exh. 82. Plaintiff's responsibilities as a senior vice president were eliminated in 1982. *See* Amdahl 10–11. The president of FICB/BC, now Burgee Amdahl, concluded that plaintiff should not be part of the senior management team, especially since plaintiff disliked planning. Amdahl also noted that he had too many senior vice presidents at that time. Amdahl 24. Amdahl considered plaintiff's change of position to general counsel and secretary a demotion. Amdahl 11–12.

Another reorganization of defendant occurred in the spring of 1983, as the management functions of FICB/BC and the FLB were consolidated. Amdahl 5. As part of the reorganization, two new legal positions needed to be filled. FCS executive vice president Larry Williams told plaintiff that plaintiff and Wally Pearson were the two leading candidates for the position of corporate counsel. Corum 154. (The FCS selected Pearson for this position in approximately late August of 1983. *See* Amdahl 250, 252.) Upon learning that he was not chosen corporate counsel, plaintiff contacted FCS executive vice president Ron Gilsrud to inquire if he still had a job at FCS. Gilsrud responded that plaintiff did indeed have a job and that plaintiff did not have to worry about it. Corum 148–49; ¶ 8.

Plaintiff was concerned about not receiving the position of corporate counsel, so shortly after Pearson's appointment, plaintiff met with Amdahl (who was now chief executive officer of the combined entity). At this meeting, plaintiff states that he told Amdahl about the agreement between FCS and plaintiff which provided that plaintiff would have a position at FCS until retirement, as long as plaintiff did a good job.

Corum ¶ 9. Neither party has indicated how Amdahl responded to this statement.

Just as he was for the position of corporate counsel, plaintiff was one of two finalists for the position of vice president, credit legal services. Johnson 90. On September 13, 1983, FCS named Linda Birdwell, a non-lawyer, to this position. Amdahl 252; Johnson 99. After Birdwell's appointment, a senior vice president at FCS, Dennis Johnson, informed plaintiff that his services were still needed. Corum 192; ¶ 8; *cf.* Johnson 99–100. Plaintiff subsequently assumed the position of director, association legal support in September of 1983. In this position, plaintiff reported directly to Birdwell. Birdwell 18–19; Exh. 126. Previously, in fact since he began his employment with FICB in 1968, plaintiff had reported directly to the top executive officer. *See* Amdahl 8–10; Exh. 5, at 2; Exh. 7, at 1. Plaintiff's new position had a job grade three levels lower than his prior position, but his salary and benefits remained the same. Corum 660–61; ¶ 15.

After plaintiff failed to obtain the position of vice president, credit legal services, he began exploring other employment possibilities. The FICB of Spokane, Washington offered plaintiff a position, but plaintiff declined the offer because it did not entail a salary increase, the Spokane FICB was having financial problems, and he believed that he had a job at the FCS until retirement. Corum 179–80; ¶ 12.

In March of 1984, Birdwell left her position as plaintiff's supervisor. Birdwell 19–20. Bill Zwick, an FCS senior vice president assumed this role on an interim basis. Zwick 11–12, 25. According to plaintiff, Zwick told plaintiff that Zwick was going to inform the new general counsel and secretary that FCS should retain plaintiff. Corum ¶ 8, *also citing* Zwick 59, Reardon 163–64.[3]

The new general counsel, Andrew Reardon, assumed his position in late June of 1984. Reardon 38. Upon assuming his

---

**3.** Zwick testified that he stated only that plaintiff, based on his knowledge and experience, could be a valuable asset to the FCS. Zwick 59.

Reardon testified that Zwick stated that plaintiff could have been valuable to FCS, but was not. Reardon 163–64.

position, Reardon decided to restructure the FCS legal department, and this reorganization included the elimination of plaintiff's position. Reardon next concluded that because of problems with plaintiff's work performance, the FCS would not retain plaintiff in another legal position. Reardon 109, 113. On August 23, 1984, the FCS' senior vice president for human resources, Don Ellenberger, sent Reardon a memorandum discussing the treatment of plaintiff's severance pay. The memorandum also states that Reardon and Ellenberger

> will need to consider the reason we give [plaintiff] for termination. Will that reason be reorganization? or performance? or perhaps a combination of both? I believe the reason should be accurate, but also one that could be verified through documentation.

Exh. 92. Reardon testified in his deposition that both the need to reorganize and plaintiff's poor job performance were accurate reasons for discharging plaintiff. Reardon 112.

On September 4, 1984, Reardon, while in his office, handed plaintiff a document informing him that his position had been abolished because of reorganization. Corum 710; Exh. 75. Reardon informed plaintiff that he was being discharged because he did not support corporate policies. Corum 710; Reardon 123–24. Reardon allegedly told plaintiff to clear out his desk and vacate the premises as soon as possible. Plaintiff contends that he was so upset by the abrupt termination that he accidentally took the FCS Legal Procedures Manual while haphazardly clearing out his desk. Corum ¶ 14.[4]

Plaintiff states that since September 4, 1984, he has heard other explanations for his discharge. Reardon did testify in his depositions to a number of reasons for terminating plaintiff's employment, including: disloyalty to employer, relationships with other workers, inadequacies as a manager, inappropriate language and ethnic in-

sults, and poor work habits. *E.g.*, Reardon 55–63. Plaintiff also states that other lawyers have told him that he was dismissed because of a drinking problem. Corum 104–06; *see also* Dewey ¶ 6. Plaintiff notes that he had excellent performance reviews throughout his career at FCS (citations omitted). (These reviews only go up to June of 1983.) At the time defendant discharged plaintiff, he was 52 years old.

Plaintiff filed the present action on March 19, 1985, asserting ten claims for relief. Those counts are:

1. Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 631–34.

2. Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363.01–.14.

3. Violation of an express contract for permanent employment.

4. Breach of a contract regarding use of a long-distance calling card.

5. Breach of an implied covenant of good faith and fair dealing.

6. Promissory estoppel.

7. Slander.

8. Interference with attainment of pension rights—Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1140.

9. Interference with attainment of employee benefit rights, Minn.Stat. § 363.03, subd. 9.

10. Reckless infliction of emotional distress.

Defendant seeks summary judgment on all of these counts except the age discrimination counts (1 and 2) and the count relating to the long-distance calling card contract (4).

Plaintiff has also sought leave to amend his complaint to add an eleventh cause of action—an implied cause of action under a provision of the Farm Credit Act and its corresponding regulations. The United States Magistrate denied plaintiff's motion to amend in an order dated December 5, 1985, and plaintiff appeals from that decision.

---

4. Defendant claims that plaintiff surreptitiously took this manual. This and other allegations comprise the basis of two of defendant's three counterclaims.

## DISCUSSION

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.,* 741 F.2d 1142, 1144–45 (8th Cir.1984). The nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City,* 751 F.2d 288, 289 (8th Cir.1984).

### Contract Claims (Counts 3, 5)

Defendant seeks summary judgment on plaintiff's two major contract causes of action. In count 3, plaintiff asserts that he and defendant had an express contract for permanent employment. Count 5 contends that the contract between the two parties contained an implied covenant of good faith and fair dealing.

Plaintiff and defendant never entered into a written employment contract. Neither did they explicitly state that plaintiff would have a contract for permanent employment or that defendant could discharge plaintiff only for good cause. Under these circumstances, the law would traditionally consider the term of plaintiff's employment to be indefinite, and defendant could terminate plaintiff's employment at-will. *See Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213, 221 (1962); Note, *At-Will Employment,* 7 HAMLINE L.REV. 463, 463 (1984). An employer can summarily discharge an at-will employee for any reason or no reason at all, while the employee is not obligated to continue on the job. *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983); *Cederstrand,* 117 N.W.2d at 221. Some states have, as a matter of law, implied into all at-will employment contracts a covenant of good faith and fair dealing which prohibits terminations motivated by bad faith. *See, e.g., Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549, 551 (1974), *Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330, 1337 n. 12 (1980). Minnesota, however, has not as a matter of law implied a covenant of good faith and fair dealing (hereafter good faith covenant) into at-will employment contracts. *See Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775, 790 (1975) (per curiam) ("[w]hether this court will read ... a condition of good faith into all contracts has not yet been decided"), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976); *Lewis v. Equitable Life Assurance Society,* 361 N.W.2d 875, 880 (Minn.Ct.App.1985) (jury instruction that employment agreements always include a covenant of good faith and fair dealing "conflicts with Minnesota law"), *rev. granted,* (Minn. Mar. 29, 1985).

Recently, though, the Minnesota courts have recognized some liberalization of the traditional employment-at-will doctrine. In 1983, the Minnesota Supreme Court declared that an employment contract may be based on assurances contained in an employee handbook. *Pine River,* 333 N.W.2d at 630–31. *Pine River* further established that the at-will rule is simply a rule of contract construction which the parties can modify by agreement. *Pine River,* 333 N.W.2d at 628–29; *see also Eklund v. Vincent Brass and Aluminum Co.,* 351 N.W.2d 371, 378 (Minn.Ct.App.), *rev. denied,* (Minn. Nov. 1, 1984) (circumstances and acts of parties may imply a covenant of good faith into an employment contract). A covenant of good faith (or other contract terms) can become part of an employment contract when an employer promises a posi-

tion on particular terms, and the individual commences employment. In such a situation, the employee has accepted an offer for a unilateral contract. *See Pine River,* 333 N.W.2d at 626. Every utterance of an employer does not constitute an offer. *Pine River,* 333 N.W.2d at 630. "The offer must be definite in form and must be communicated to the offeree.... An employer's general statements of policy" do not suffice. *Pine River,* 333 N.W.2d at 626; *see also Tobias v. Montgomery Ward and Co.,* 362 N.W.2d 380, 381 (Minn.Ct.App.), *rev. granted,* (Minn. May 1, 1985).

In count 3, plaintiff is claiming that he had a permanent contract of employment. Minnesota law is reluctant to impose upon an employer the burdensome obligation of a permanent employment contract absent a promise explicitly creating such a relationship. *Pine River,* 333 N.W.2d at 627; *see also Degen v. Investors Diversified Services, Inc.,* 260 Minn. 424, 110 N.W.2d 863, 866–67 (1961). Absent a clear intent to form a contract of permanent employment, an employee's claim of a promise of permanent employment will not prevail unless the employee supplies some consideration beyond that which is normally involved in the employment relationship itself. *See Pine River,* 333 N.W.2d at 627, 629; *Bussard v. College of St. Thomas, Inc.,* 294 Minn. 215, 200 N.W.2d 155, 161 (1972). In *Bussard,* for example, the additional consideration was shares of stock which the employee gave to the employer in exchange for permanent employment. *Bussard,* 200 N.W.2d at 159. The requirement of additional consideration is not an absolute prerequisite to a contract of permanent employment, rather it is a rule of construction. Absent additional consideration, parties can still create permanent employment contracts by making clear their intent to do so. *Pine River,* 333 N.W.2d at 629; *Dumas v. Kessler & Maguire Funeral Home, Inc.,* 380 N.W.2d 544, 547 (Minn.Ct.App. 1986).

■ Here, plaintiff did not provide any consideration in addition to his services as an employee such that he could benefit from this rule of construction. Plaintiff argues that he supplied extra consideration by declining other job offers while working for defendant, but simply foregoing other work opportunities by accepting one job over another does not constitute additional consideration. *See Montgomery v. American Hoist & Derrick Co.,* 350 N.W.2d 405, 408 (Minn.Ct.App.1984).

■ Plaintiff also maintains that he did supply additional consideration because he specialized in farm credit law, which limited his employment opportunities. Perhaps plaintiff is correct that his work with farm credit law has given him expertise which is not easily transferable.[5] Nevertheless, plaintiff stated that Article Nine of the Uniform Commercial Code (secured transactions) was one of his three major areas of substantive legal work, and many lawyers work with article nine. Even assuming plaintiff's specialization caused him to forego many legal opportunities, plaintiff has still not provided the necessary additional consideration. Simply foregoing other job opportunities and their corresponding advantages does not constitute additional consideration under *Bussard.* *Montgomery,* 350 N.W.2d at 408. Many lawyers and employees in other fields specialize, thus specialization is not an unusual choice for an employee to make in selecting a career path. *Montgomery* indicates that relinquishing any advantage associated with accepting one job over another does not amount to additional consideration. *Montgomery,* 350 N.W.2d at 408. Plaintiff's specialization to the exclusion of other job opportunities, therefore, does not constitute the additional consideration required to negate the presumption against contracts of permanent employment.

■ Having failed to overcome the presumption against permanent employment contracts by providing additional considera-

---

**5.** The Court recently decided a case dealing with the Farm Credit Act, and two private Minnesota law firms were heavily involved. *Spring Water* *Dairy, Inc. v. Federal Intermediate Credit Bank of St. Paul,* 625 F.Supp. 713 (1986).

tion, plaintiff must demonstrate that he and defendant clearly intended to create such a contract. *See Pine River,* 333 N.W.2d at 629. In attempting to do so, plaintiff relies on a number of statements by employees of defendant. Initially, plaintiff points to president Lampen's statements that plaintiff would not get rich working for defendant, but plaintiff would have "job security." Lampen first made this remark when he was recruiting plaintiff in 1968. Such a statement, however, is simply too general to constitute an offer of permanent employment. Lampen's remarks are quite similar to those the employer made to the employee in *Degen.* There, the employer told the employee that he had a great future with the company and to consider his job as a "career situation." The Minnesota Supreme Court concluded that such statements did not constitute an offer for a lifetime employment contract. *Degen,* 110 N.W.2d at 865–66, *cited in, Pine River* 333 N.W.2d at 626. The *Pine River* court, itself, found language in an employee handbook stating that the employer offered job security to be insufficient to amount to an offer. *Pine River* 333 N.W.2d at 626, 626 n. 2, 630. Even promises of "permanent" employment may only amount to general policy statements. *Bakker v. Metropolitan Pediatric, P.A.,* 355 N.W.2d 330, 331 (Minn. Ct.App.1984). Similarly, the Minnesota Court of Appeals, recently concluded that an employer telling an employee that they would "retire together" did not constitute an offer of permanent employment. *Dumas,* 380 N.W.2d at 547. Lampen's statement, moreover, does not even approach the specificity of the promise upon which the *Eklund* court relied. In *Eklund,* the plaintiff explicitly stated that he told the defendant that he would accept only an offer of permanent employment, and the court noted that both parties actually intended to create a permanent employment contract. *Eklund,* 351 N.W.2d at 373.[6] The court

later states that the defendant actually promised the plaintiff permanent employment. *Eklund,* 351 N.W.2d at 378.

■ Other statements upon which plaintiff relies occurred in 1983. An executive vice president of defendant told plaintiff he was a leading candidate for the position of corporate counsel. After plaintiff was unsuccessful in his bid for this position, he inquired whether he still had a job with defendant, and a different executive vice president told plaintiff not to worry. This later statement, however, speaks to the question of whether plaintiff had any job with defendant at all, and neither of these 1983 remarks are specific indications that plaintiff had a contract for permanent employment. Similarly, after plaintiff began reporting to a new supervisor in 1984, the supervisor, a senior vice president, told plaintiff that defendant still needed plaintiff's services. Again, this statement is not a specific indication of a permanent employment contract.

■ Plaintiff also points to a remark he made in 1983. Subsequent to another employee receiving the new consolidated position of corporate counsel in 1983, plaintiff purportedly told defendant's top executive, Amdahl, that plaintiff had a permanent contract of employment with defendant as long as plaintiff's work was good. Plaintiff's remark to Amdahl, however, merely evinces plaintiff's understanding of his contract, and it cannot constitute an offer from defendant because defendant is not making a promise. Plaintiff further states that at numerous times during his career, his understanding what that he had a permanent job with defendant. The existence of a contract, however, depends upon the parties' observable conduct, not on their subjective intentions. *Pine River,* 333 N.W.2d at 626, *citing Cederstrand,* 117 N.W.2d at 221; *Dumas,* 380 N.W.2d at 547. Plaintiff's subjective expectation of permanent employment, therefore, cannot create a

---

**6.** Plaintiff argues that Lampen's remarks took on increased significance because he repeated them in 1970 or 1971 as a response to plaintiff's concerns of becoming too specialized in farm credit law. The fact remains, though, that Lampen's statements in 1970 or 1971 were no more specific than before.

contract in accordance with his understanding. *Hendrickson v. Advanced United Expressways, Inc.*, CIVIL 4–84–1079, slip op. at 6 (D.Minn. Nov. 12, 1985) (MacLaughlin, J.); *Schwartz v. Michigan Sugar Co.*, 106 Mich.App. 471, 308 N.W.2d 459, 462 (1981).

■ Plaintiff further maintains that his consistently good performance reviews throughout his many years with defendant, along with the remarks of defendant's executives, caused him to never question his understanding that he had a permanent contract. A long term of service and good performance review do not, by themselves, justify an implied contract term for continued employment. *Dumas*, 380 N.W.2d at 546; *see also Bakker*, 355 N.W.2d at 331.

■ Thus, even under plaintiff's version of the facts, defendant never manifested a clear intent to offer plaintiff a permanent contract of employment. This same absence of objective indications that the parties intended to modify the traditional at-will employment relationship also causes plaintiff's fifth count to fail. Plaintiff's fifth count alleges that an implied good faith covenant existed in plaintiff's employment contract. Under this implied provision, states plaintiff, defendant could discharge plaintiff only if plaintiff's work was not good. Minnesota law does not imply such a term into contracts, *Lewis*, 361 N.W.2d at 880, but the circumstances and acts of the parties may, as a matter of fact, imply this covenant into an employment relationship. *See Eklund*, 351 N.W.2d at 378. To support his contention that an implied good faith covenant exists in his employment contract, plaintiff relies on the same evidence upon which he tried to base his claim of permanent employment. As previously discussed, however, the statements to which plaintiff points and plaintiff's foregoing other opportunities does not constitute conduct manifesting an intent to modify the at-will employment relationship.

Finally, plaintiff argues that the Court should allow counts 3 and 5 to go to a jury because summary judgment is inappropriate in a breach of contract claim where the contract and its terms are in dispute. *Eklund*, 351 N.W.2d at 376. Summary judgment, however, is appropriate where, even accepting a plaintiff's version of the facts as true, the plaintiff cannot establish a modification of the at-will employment doctrine. *Dumas*, 380 N.W.2d at 546; *Bakker*, 355 N.W.2d at 331; *see also Degen*, 110 N.W.2d 863 (affirming summary judgment); *Montgomery*, 350 N.W.2d at 408 (same).

**Promissory Estoppel (Count 6)**

■ In his sixth cause of action, plaintiff asserts that he is entitled to recover against defendant on the basis of promissory estoppel. The necessary elements for a cause of action under this doctrine are:

1. the defendant made a promise;
2. the defendant expected or should have reasonably expected the promise to induce substantial and definite action by the promisee;
3. the promise did induce such action;
4. the promise must be enforced to avoid injustice.

*AFSCME Councils v. Sundquist*, 338 N.W.2d 560, 568 (Minn.1983), *appeal dismissed*, 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984); *Grouse v. Group Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn.1981).

Defendant argues that to allow plaintiff to assert a cause of action for promissory estoppel when plaintiff cannot maintain an action for breach of a covenant of good faith, would totally circumvent the Minnesota Supreme Court's decision in *Pine River. See Grouse*, 306 N.W.2d at 116 (employer not liable under promissory estoppel whenever employer discharges an at-will employee); *Dumas*, 380 N.W.2d at 548 (same). Plaintiff responds that the very purpose of promissory estoppel is to provide a cause of action where traditional contract law does not. *Grouse*, 306 N.W.2d at 116;[7] *see also Eklund*, 351 N.W.2d at 378

**7.** The statement in *Grouse*, 306 N.W.2d at 116, that the effect of promissory estoppel "is to imply a contract in law where none exists in fact" is somewhat difficult to harmonize with the cases which indicate that Minnesota law does not imply as a matter of law, a good faith

(plaintiff could present at trial a theory based on promissory estoppel and express contract).

In *Eklund,* 351 N.W.2d at 378, however, the defendant actually promised the plaintiff permanent employment, and the plaintiff produced evidence that he relied on that promise. Here, by contrast, the defendant did not make any such explicit promise. As previously indicated, the statements upon which plaintiff relies are too general to constitute a promise. Since, even accepting plaintiff's version of the facts, plaintiff cannot establish a promise of permanent employment (or employment terminable only for good cause), plaintiff cannot satisfy the first essential element of a promissory estoppel claim. Summary judgment is therefore appropriate on count 6.

## Defamation (Count 7)

The seventh cause of action in plaintiff's complaint is for defamation (slander). Plaintiff claims that employees of defendant stated that defendant fired plaintiff because he had an alcohol problem. Plaintiff relies on the affidavit of David Dewey, who for 27 years, was an attorney for farm credit banks in Wichita, Kansas. Dewey ¶ 1. In October of 1984 (which is shortly after plaintiff's discharge), Dewey was attending the annual Farm Credit System general counsel's conference. Defendant had sent its general counsel Reardon and Charles Dana to the conference. Dewey ¶ 4. (Dewey knows Dana fairly well, but Dewey does not know Reardon well. Dewey thinks that he would have difficulty recognizing Reardon if he passed him on the street. Dewey ¶ 7.) Dewey states that during one of the conference's social hours, he heard that plaintiff "might have had a drinking problem and that his drinking problem may have been a reason leading to his termination of employment." Dewey ¶ 6. Dewey does not specify from whom he heard this remark. Dewey further

notes that he does not know whether Reardon or Dana were present during this social hour. Dewey ¶ 7.

In addition to Dewey's statements, plaintiff also relies on the affidavit of Peter Henstra. Henstra is a family farmer who borrowed money from the Production Credit Association of Worthington, Minnesota (PCA). Henstra ¶ 1–2. In connection with his efforts to settle a dispute with the PCA, Henstra sought to obtain certain documents from the PCA. Henstra ¶ 3–5. Henstra also informed the PCA that plaintiff probably would be one of the attorneys representing him. On November 25, 1985, a PCA official purportedly told Henstra that the PCA's attorneys in New Ulm, Minnesota advised him that "if that alcoholic Jim Corum wants those papers, he is going to have to fight for them." Henstra ¶ 7.

To establish a cause of action for defamation, plaintiff must show a false statement that was communicated to someone other than plaintiff. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn. 1980); *Lewis,* 361 N.W.2d at 880. Plaintiff must further show that defendant made the false and defamatory statement. *Nadeau v. County of Ramsey,* 277 N.W.2d 520, 523 (Minn.1979); *Swanson v. American Hardware Mutual Insurance Co.,* 359 N.W.2d 705, 707 (Minn.Ct.App.1984), *rev. denied,* (Minn. Mar. 6, 1985).

Plaintiff maintains that Dewey's affidavit is strong circumstantial evidence that employees of defendant made the statement. Plaintiff reasons that because the conference was only a month or so after plaintiff was fired, and because two employees of defendant were at the conference, a strong inference exists that defendant's employees made the statement. Dewey's affidavit, however, is not strong circumstantial evidence that an employee of defendant made the statement in question.[8] Not only is Dewey unable to identify

---

covenant into all at-will employment contracts. *See Wild,* 234 N.W.2d at 790; *Lewis,* 361 N.W.2d at 880.

**8.** The statement itself is quite cautious, as it says that plaintiff *"might* have had a drinking problem" which *"may* have been *a* reason" for his discharge. Dewey ¶ 6 (emphasis added).

who made this statement, he is not even sure if defendant's employees were at the social function where Dewey heard the remark. The fact that someone at the conference made the remark in question is not sufficient evidence to allow a jury to conclude that defendant made the statement. *See Nadeau,* 277 N.W.2d at 523.

■ Neither does the Henstra affidavit provide sufficient evidence to support a reasonable inference that defendant has made defamatory statements. Plaintiff's count 7 alleges defamation based on remarks indicating that defendant discharged plaintiff because of his drinking problem. The statement of the PCA official, however, makes no reference to plaintiff's drinking being a reason for defendant firing him. In addition, this statement is not attributable to defendant. A PCA official made the statement to Henstra, and the official noted his source as the PCA's attorneys in New Ulm.[9]

In sum, plaintiff suspects and speculates that defendant has made defamatory statements, but mere suspicion and conjectural assertions are not sufficient to resist a motion for summary judgment. *See Roberts v. Browning,* 610 F.2d 528, 532 (8th Cir.1979); *Hughes v. American Jawa, Ltd.,* 529 F.2d 21, 26 (8th Cir.1976); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2727, at 167–69 (1983). Accordingly, the Court will grant defendant's motion for summary judgment with respect to count 7.

**Pension Claims (Counts 8 and 9)**

Plaintiff's eighth cause of action is based on section 510 of ERISA, 29 U.S.C. § 1140, which prohibits employers from discharging employees for the purpose of "interfering with the attainment of any right" under an employee benefit plan. At the time Reardon discharged plaintiff, Reardon allegedly said that he had the authority to continue plaintiff's employment until plaintiff was eligible for early retirement, but he did not want to continue plaintiff's employment. Complaint ¶ 39. Plaintiff claims that as a result of his termination, he lost pension, insurance, and other benefits he would have been entitled to, had his employment continued until retirement. Complaint ¶ 40. At the time of his discharge, plaintiff's pension rights were vested. *See* Ellenberger ¶ 3.

■ The purpose of 29 U.S.C. § 1140 was primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980). Since plaintiff's pension rights were vested, he cannot maintain that defendant fired him in order to prevent plaintiff from obtaining vested pension rights. *See Baker v. Kaiser Aluminum and Chemical Corp.,* 608 F.Supp. 1315, 1318–19 (N.D.Cal.1984). Neither can plaintiff maintain an ERISA action based on defendant's denying him the opportunity to participate in defendant's early retirement program, because ERISA does not give employees any right to early retirement benefits. *E.g., McBarron v. S & T Industries, Inc.,* 771 F.2d 94, 99 (6th Cir.1985); *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574, 577–78 (3d Cir.1985); *Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406, 410 (4th Cir. 1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984).

■ Nevertheless, plaintiff argues that defendant violated ERISA because in discharging plaintiff, defendant prevented plaintiff from accruing the additional benefits which are associated with continued employment. In order to recover on his ERISA claim, plaintiff must establish that defendant discharged him with the specific intent to interfere with plaintiff's rights under defendant's protected benefit plans. *E.g., Baker,* 608 F.Supp. at 1318; *Watkin-*

---

**9.** Although the PCA is subject to the supervision of the FICB, the PCA and the FICB are distinct corporate entities. *See* 12 U.S.C. § 2093. Plaintiff himself states in his brief that PCAs are not local operating units of FICBs, rather PCAs are separate federal instrumentalities. Therefore, a statement by a PCA official is not a remark by an employee of defendant.

*son v. Great Atlantic & Pacific Tea Co.,* 585 F.Supp. 879, 883 (E.D.Pa.1984). Denying a vested employee the opportunity to accrue additional benefits, however, has only an incidental effect on plaintiff's right to benefits. Such an impact, moreover, "would result from any discharge." *Baker,* 608 F.Supp. at 1319. Where the only evidence that an employer specifically intended to violate ERISA is the employee's lost opportunity to accrue additional benefits, the employee has not put forth sufficient evidence to defeat summary judgment. *See Baker,* 608 F.Supp. at 1319. Such is the case here, and the Court will grant summary judgment on count 8.

Plaintiff's ninth cause of action is also based on defendant's purported interference with plaintiff's attainment of rights under the benefit plans, but this claim for relief is based on Minn.Stat. § 363.03, subd. 9. That provision is part of the MHRA, and it declares that "discrimination on account of age" includes interference with an employee's opportunity to acquire pension benefits. Minn.Stat. § 363.03, subd. 9.

The parties strenuously dispute whether ERISA preempts Minn.Stat. § 363.03, subd. 9, *see* 29 U.S.C. § 1144(a) and (d); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1214 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *Nolan v. Otis Elevator Co.,* 197 N.J.Super. 468, 485 A.2d 312, 314–15 (App.Div.1984). The Court, however, need not reach this issue since plaintiff's state cause of action for interference with pension rights fails for the same reason that his federal claim based on ERISA fails. (To the extent that plaintiff's count 9 is actually seeking to redress age discrimination, plaintiff still has a remedy in count 1 (ADEA) and count 2 (MHRA).) Summary judgment is thus warranted for count 9.

**Intentional Infliction of Emotional Distress (Count 10)**

Plaintiff's tenth cause of action is one for the reckless infliction of emotional distress. The elements necessary for such a cause of action are:

1. extreme and outrageous conduct;

2. the conduct was intentional or reckless;

3. the conduct caused emotional distress;

4. the emotional distress was severe.

*Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983), *citing* Restatement (Second) of Torts § 46(1) (1965). A plaintiff must meet a high threshold before a court can submit a claim under this tort to a jury. *Hubbard,* 330 N.W.2d 439; *Eklund,* 351 N.W.2d at 379. The conduct complained of must be "extreme and outrageous" such that it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard,* 330 N.W.2d at 439 (quotation omitted).

Here, plaintiff argues that defendant's conduct meets this standard because defendant fired plaintiff with no warning after years of loyal service. In addition, plaintiff notes that he had to clean out his desk and leave immediately. Plaintiff further relates his extreme reaction to his discharge. This reaction included plaintiff, a reformed alcoholic, going on a drinking binge and having to be hospitalized within hours after the discharge. Insomnia, anxiety, depression, and strained family relations are all purportedly part of the effects plaintiff feels. Corum 258, 275–76; ¶ 16. Finally, plaintiff states that defendant has put plaintiff under surveillance and continued trying to harass him.[10]

Defendant initially argues that plaintiff's distress is not more severe than that suffered by the plaintiff in *Hubbard.* There, the plaintiff (who also was a reformed alcoholic) testified that he was depressed, threw up, had stomach disorders, and developed a rash and high blood pressure. The *Hubbard* court concluded that the plaintiff's injuries did not allow submission of his case to the jury. *Hubbard,* 330 N.W.2d at 440.

---

**10.** These allegations do not appear in plaintiff's complaint.

The Court, however, need not decide this issue, because defendant's conduct in this case cannot meet the high threshold of outrageous behavior. Reardon informed plaintiff of the discharge in the privacy of Reardon's office, and apparently Reardon did not even raise his voice during the conversation. An employer's disciplining and criticizing employees does not in itself constitute sufficient egregious conduct. *See Hubbard,* 330 N.W.2d at 439. Neither does an abrupt discharge without warning meet the requirement. *See Eklund,* 351 N.W.2d at 374, 379. Thus, even though the manner in which defendant fired plaintiff was distasteful, plaintiff has not put forth any indication that the termination of his employment involved acts beyond the boundaries of decency.

Neither do defendant's alleged actions after the discharge meet the necessary threshold. Plaintiff claims he is under surveillance. Plaintiff does not claim that defendant's agents are threatening him or verbally abusing him, rather he asserts that they are watching him. These allegations do not involve outrageous conduct. A person who is in a public place has no reasonable expectation of privacy to not have his or her conduct observed. *See United States v. Knotts,* 460 U.S. 276, 281–82, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (police placing beeper in a container purchased by a defendant, and the police using the beeper to follow the defendant did not intrude on a reasonable expectation of privacy). Similarly, being the object of an investigation, whether justified or not, does not implicate any constitutional right, since it is simply a burden to which every citizen is exposed. *Kaylor v. Fields,* 661 F.2d 1177, 1181–82 (8th Cir.1981). Plaintiff, of course, is not claiming a violation of any constitutional rights by law enforcement officials, but *Knotts* and *Kaylor* indicate that defendant's agents' merely watching plaintiff is not egregious conduct.

These observations of plaintiff are purportedly part of defendant's plan to "get" plaintiff. *See* Corum ¶ 23. Yet since these actions themselves do not constitute outrageous conduct, plaintiff's feeling harassed and even an intention by defendant to harass plaintiff does not transform the actions into outrageous conduct. *See Hubbard,* 330 N.W.2d at 439–40. The Court, therefore, will grant defendant's summary judgment motion as it pertains to count 10.

### Appeal from Magistrate's Order

The final issue presently before the Court is plaintiff's appeal from the December 5, 1985 order of the United States Magistrate. The Magistrate, in a well-reasoned opinion, denied plaintiff's motion for leave to amend his complaint. Plaintiff sought to amend his complaint to assert an eleventh theory of recovery based on an implied cause of action under the Farm Credit Act, 12 U.S.C. §§ 2001–2260, and its corresponding regulations.

The Court need not allow an amendment to a complaint if the amendment is futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Senart v. Mobay Chemical Corp.,* 597 F.Supp. 502, 506 (D.Minn.1984). In *Spring Water Dairy, Inc. v. Federal Intermediate Credit Bank of St. Paul,* 625 F.Supp. 713 (1986), the Court joined a growing number of courts which have held that no implied private cause of action exists under the Farm Credit Act. *See Smith v. Russellville Production Credit Association,* 777 F.2d 1544, 1546–48 (11th Cir.1985); *Bowling v. Block,* 602 F.Supp. 667, 670–71 (S.D.Ohio 1985), *appeal pending,* No. 85–3204 (6th Cir.); *Hartman v. Farmers Production Credit Association of Scottsburg,* 628 F.Supp. 218 (S.D.Ind.1983); *Johansen v. Production Credit Association of Marshall-Ivanhoe,* 378 N.W.2d 59 (Minn.Ct. App.1985).[11] No type of implied cause of

---

11. Plaintiff's citation to Representative De la Garza's indication that the 1985 amendments to the Farm Credit Act establish rights for borrowers enforceable in courts does not aid plaintiff.

*See* 131 Cong.Rec. H11518–19 (daily ed. Dec. 10, 1985). Assuming Representative De la Garza's statements are persuasive legislative history, *see Monterey Coal Co. v. Federal Mine Safety &*

action is maintainable under the Farm Credit Act. *See Smith*, 777 F.2d at 1547; *Block*, 602 F.Supp. at 670, *quoting Hartman*, 628 F.Supp. at 222. Failing to imply the private cause of action plaintiff desires does not frustrate the purposes of the act because employees of defendant still have available to them (as is evident from plaintiff's complaint) a number of federal and state remedies under which they can attempt to redress their employment claims. *Cf. Spring Water Dairy, Inc.*, at 720 (failing to imply private cause of action would not frustrate purpose of act because farmers can still protect their rights as debtors under state law). In sum, since plaintiff's proposed eleventh cause of action fails to state a claim, granting plaintiff leave to assert it would have been an exercise in futility. The Magistrate's decision, therefore, was not contrary to law and the Court will affirm the Magistrate.

## ORDER

Based upon the foregoing, IT IS ORDERED that defendant's motion for partial summary judgment is granted in all respects; thus summary judgment is granted on counts 3, 5, 6, 7, 8, 9, and 10 of plaintiff's complaint.

IT IS FURTHER ORDERED that the December 5, 1985 order of the United States Magistrate is affirmed.

*Health Review*, 743 F.2d 589, 595–98 (7th Cir. 1984) (refusing to give decisive weight to House floor remarks of a representative substantially involved in development of an act) *cf. Regan v. Wald*, 468 U.S. 222, 104 S.Ct. 3026, 3035–36, 82 L.Ed.2d 171 (1984), they still do not help plaintiff. Plaintiff is attempting to assert an implied cause of action under this act based on events occurring well over a year before the passage of the 1985 amendment.