**Allan T. HEATH, Plaintiff,**

v.

**MASSEY–FERGUSON PARTS COMPANY, a DIVISION OF MASSEY–FERGUSON, INC., Defendant.**

No. 92–C–515.

United States District Court,
E.D. Wisconsin.

Oct. 25, 1994.

Order Denying Reconsideration
Dec. 8, 1994.

Lawrence M. Shindell, Anne B. Shindell, Shindell & Shindell, Milwaukee, WI, for plaintiff.

James R. Scott, Lindner & Marsack, S.C., Milwaukee, WI, for defendant.

## DECISION AND ORDER

RANDA, District Judge.

This matter comes before the Court on the following motions: (1) defendant's motion for summary judgment; (2) plaintiff's motion for a jury trial and submission of a punitive damages question on the ERISA claim; (3) plaintiff's motion to preclude exhibits; (4)

plaintiff's motion to preclude the testimony of certain defense witnesses; (5) defendant's motion to preclude the testimony of certain plaintiff witnesses. On September 28, 1994 the Court faxed a letter to counsel informing them of the Court's intended disposition of the foregoing motions and adjourning the final pretrial. The court further indicated that a written decision and order would follow. The following constitutes the Court's decision in the matter.

## FACTS

In July of 1962, the defendant, Massey–Ferguson Parts Company—Division of Massey–Ferguson, Inc. ("MF"), hired the plaintiff, Allan T. Heath ("Heath"), to work at an MF parts plant located in Racine, Wisconsin. (Complaint at ¶ 5; Answer at ¶ 5; Defendant's Proposed Findings of Fact ("DFOF") at ¶ 2.) Heath worked at the Racine plant for almost 29 years until his termination on January 10, 1991. (DFOF at ¶ 1; Complaint at ¶ 5; Answer at ¶ 5.) When terminated, Heath was 51 years old and the Director of Parts for the North American Parts Division. (DFOF at ¶¶ 1, 9; Complaint at ¶ 6; Answer at ¶ 6.) Heath's job performance played no part in his termination. (Pieper Aff. at Exs. B–C; MF Brief in Support at 4.) MF claims Heath's termination was caused by a corporate reorganization.[1] (Complaint at ¶ 7; Answer at ¶ 7.) Specifically, MF claims it combined Heath's position with that of Bruce Plagman's ("Plagman"), at the time a 39 year old Director of Sales and Marketing. (DFOF at ¶¶ 4, 7.) The new combined position was Director of Parts Operations–North America and was given to Plagman over Heath. (DFOF at ¶ 7.) Heath disputes MF's assertion that the two positions were combined, claiming that Plagman merely took over Heath's former duties and that other MF employees became responsible for Plagman's former duties. (Nelson Aff. at ¶¶ 2–10; Tyson Aff. at ¶¶ 3–18; Third Heath Aff. at ¶¶ 14–27.)

MF maintained a pension plan, known as the Retirement Income Plan ("the Plan"), as part of its general welfare benefits package

---

1. The parties dispute whether the sole purpose of the reorganization was to reduce costs. (Com-

plaint at ¶ 7; Answer at ¶ 7.) The dispute is immaterial to the Court's decision.

for salaried employees. (DFOF at ¶ 10; Pieper Aff. at Ex. O.) Although the complete details of the plan are not disclosed by either party, the Court may infer from the submissions that an employee became eligible to receive full pension benefits, including medical and life insurance benefits, upon reaching a certain age. The Court says "eligible to receive" because the actual "right" to such benefits "vested" much earlier in the employment relationship, after a minimum number of years in service. Once vested, the right to pension benefits was not eliminated or otherwise affected by termination. However, actual payment of such benefits would not begin until the terminated employee reached the required age.

At one time the Plan also had an early retirement option, whereby salaried employees could retire with full pension benefits after 30 years of service regardless of age. (DFOF at ¶ 11; Third Heath Aff. at ¶ 64.) This was called the "30 and Out" option. (Id.) In late 1987 through early 1988, MF considered eliminating the 30 and Out program altogether. (DFOF at ¶ 12; Third Heath Aff. at ¶ 64.) Heath was a party to these discussions and claims that MF wanted to eliminate the program in order to reduce its pension costs. (DFOF at ¶ 14; Third Heath Aff. at ¶ 64.) Heath advocated retention of the program, arguing that elimination would be unfair to those long-term employees who had counted on early retirement. (Third Heath Aff. at ¶ 65.) Effective May 1, 1988, MF eliminated the 30 and Out option, except that it "grandfathered" or retained the program for those employees who had 20 or more years of service as of the elimination date. (DFOF at ¶ 13; Third Heath Aff. at ¶ 66.) These employees could retire with a full pension under any of three circumstances: (1) 30 years of service regardless of age; (2) service and age equalling 85; or (3) age 60 or older. (Heath Dep. at 63–64; Third Heath Aff. at Ex. R–3.)

Heath was one of the employees "grandfathered" into the 30 and Out program. (DFOF at ¶ 14.) Plagman was not. (DFOF at ¶ 4.) While Heath was fully vested in an accrued pension benefit at the time of his termination, he was still 18 months away from qualifying for early retirement under the 30 and Out program. (DFOF at ¶¶ 9, 15.) For that reason, Heath objected to his termination and requested transfer to one of two other available positions so that he could continue working until he qualified for early retirement. (Complaint at ¶ 7; Pieper Aff. at Ex. L; MF Reply Brief at 2.) MF rejected this request, apparently because of the additional pension and health insurance costs. (Pieper Aff. at Ex. L; MF Reply Brief at 2.) It also appears that MF hired two individuals for these positions who were both older than Heath and who were already retirees from other companies. (Christman Aff. at ¶¶ 5–7; Third Heath Aff. at ¶¶ 35, 46; MF Reply Brief at 2.)

Heath brought suit under the Employee Retirement Income Security Act ("ERISA") and the Age Discrimination in Employment Act ("ADEA"). Under both claims, Heath alleges he was terminated in an effort to preclude his eligibility for early retirement. He seeks trial by jury and declaratory and equitable relief including compensatory and punitive damages.

## LAW

### I. MOTION FOR SUMMARY JUDGMENT

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Summary judgment is no longer a disfavored remedy. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. at 2555. It "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material

fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law", *Whetstine v. Gates Rubber Co.,* 895 F.2d 388, 392 (7th Cir.1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* Rather, the standard for summary judgment is now the same as that for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Such principles insure that summary judgment is utilized "when it can be shown that a trial would serve no useful purpose." *Windham v. Wyeth Laboratories, Inc.,* 786 F.Supp. 607, 610 (S.D.Miss.1992).

## A. The ERISA Claim.

There are significant factual disputes surrounding the question whether MF terminated Heath in order to prevent him from becoming eligible for early retirement benefits. Moreover, these disputes are genuine, such that the Court cannot, under the principles just discussed, resolve the disputes on its own. Normally, this would compel the Court to deny summary judgment. One of MF's arguments, however, is based on a single undisputed fact and is more in the nature of a 12(b)(6) motion to dismiss. The undisputed fact is that Heath was fully vested in MF's retirement plan at the time of his termination. When he reaches the required age, Heath will be eligible to receive his accrued pension payments and other benefits. His termination did nothing to change this. Rather, Heath's termination simply prevented him from becoming eligible to receive these payments and benefits at an earlier date by virtue of becoming eligible for early retirement. From this MF argues that Heath's claim must be dismissed, because once an employee is fully vested in a retirement plan, nothing in ERISA prevents his or her employer from terminating that employee, even if termination was for the express purpose of avoiding the accrual of additional benefits. The argument essentially states that ERISA only protects an employee's initial vesting into a retirement plan and does nothing to prevent or remedy an employer's decision to terminate a vested employee before he can attain specific additional benefits provided by the plan. The issue poses a difficult question of statutory interpretation upon which several courts have reached different conclusions. *See e.g., Kross v. Western Electric Co.,* 701 F.2d 1238 (7th Cir. 1983); *Seaman v. Arvida Realty Sales,* 985 F.2d 543 (11th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255

(1993); *Conkwright v. Westinghouse Electric Corporation*, 933 F.2d 231 (4th Cir.1991); *Dister v. Continental Group, Inc.*, 859 F.2d 1108 (2d Cir.1988), holding that ERISA protects the right of vested employees to receive additional benefits, and *see also, Baker v. Kaiser Aluminum & Chemical Corporation*, 608 F.Supp. 1315 (N.D.Cal.1984); *Corum v. Farm Credit Services*, 628 F.Supp. 707 (D.Minn.1986), holding to the contrary.

### 1. The statute.

We deal here with § 510 of ERISA, codified at 29 U.S.C. § 1140 and entitled "Interference with Protected Rights". The statute reads, in pertinent part:

> It shall be unlawful for any person *to discharge, fine, suspend, expel, discipline, or discriminate* against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C.A. § 301 et seq.], *or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.*

29 U.S.C. § 1140. (Emphasis supplied.)

Read broadly, the foregoing language could proscribe *any* action taken against an employee or group of employees, vested or non-vested, for the express purpose of avoiding the attainment of *any* benefit provided under a benefit plan. So read, the statute would have far-reaching implications. The discharge proscription would prevent MF from discharging Heath in order to avoid paying him early retirement benefits and the discrimination proscription would prevent MF from amending or modifying the plan in order to accomplish the same result, particularly where the amendment somehow singled Heath out from other employees for whom such benefits were made available. Under a literal reading of the statute, both acts would be taken "for the purpose of interfering with the attainment of *any right* to which such participant[s] *may become entitled* under the plan." The statute would thus greatly restrict an employer's ability to alter or reduce

his future benefit obligations so as to address the changing economic realities unique to each employer. Perhaps for this reason, courts are reluctant to interpret § 510 so broadly.

### 2. Construction—plan amendments.

█ The latter point is best demonstrated by decisions regarding *the amendment* of a plan to alter or eliminate a specific benefit for the express purpose of preventing an employee, or group of employees, from attaining that benefit. Such amendments have frequently been challenged on the grounds suggested above, *i.e.*, that they "discriminate" against those employees affected by the amendment for the purpose of interfering with the attainment of a right which they would have become eligible for in the future. *See e.g., McGath v. Auto–Body N. Shore, Inc.*, 7 F.3d 665 (7th Cir.1993); *Owens v. Storehouse, Inc.*, 984 F.2d 394 (11th Cir. 1993); *McGann v. H & H Music Co.*, 946 F.2d 401 (5th Cir.1991); *Aronson v. Servus Rubber Division of Chromalloy*, 730 F.2d 12 (1st Cir.1984), *cert. denied* 469 U.S. 1017, 105 S.Ct. 431, 83 L.Ed.2d 357 (1984); *International Union, United Auto., etc. v. Park–Ohio Industries, Inc.*, 661 F.Supp. 1281 (N.D.Ohio 1987). Courts acknowledge that a literal reading of § 510 supports such a claim:

> The problem is with the word "discriminate". An overly literal interpretation of this section would make illegal any partial termination, since such terminations obviously interfere with the attainment of benefits by the terminated group, and, indeed, are expressly intended so to interfere.

*Aronson*, 730 F.2d at 16.

> To adopt [plaintiff's] contrary construction of this portion of section 510 would mean that an employer could not effectively reserve the right to amend a medical plan to reduce benefits respecting subsequently incurred medical expenses, ... because such an amendment would obviously have as a purpose preventing participants from attaining the right to such future benefits as they otherwise might do under the existing plan absent the amendment.

*McGann*, 946 F.2d at 405.

§ 510 is not interpreted so expansively. The analysis differs from opinion to opinion,

but three basic rationales are found. First, the elimination of an unaccrued "benefit" under a plan is not the elimination of a "right" to which the employee may become entitled because ERISA does not mandate any specific benefits and because most employers reserve the right to amend and/or terminate their plans:

> The "right" referred to [in § 510] is not any right in the abstract. Rather, it is one specifically conferred by the plan or by ERISA. As discussed, ERISA does not confer a right to particular health benefits. Moreover, Storehouse reserved the right to amend its plan at any time and acted pursuant to that right.

*Owens,* 984 F.2d at 399. (Citations omitted.)

Furthermore, [plaintiff] has failed to adduce evidence of the existence of "any right to which [he] may become entitled under the plan." The right referred to in the second clause of section 510 is not simply any right to which an employee may conceivably become entitled, but rather any right to which an employee may become entitled pursuant to an existing, enforceable obligation assumed by the employer. "Congress viewed [section 510] as a crucial part of ERISA because, without it, employers would be able to circumvent the provision of *promised* benefits."

[Plaintiff's] allegations show no *promised* benefit, for there is nothing to indicate that defendants ever promised that the $1,000,000 coverage limit was permanent. The H & H Music plan expressly provides: "Termination or Amendment of Plan: The Plan Sponsor may terminate or amend the Plan at any time or terminate any benefit under the Plan at any time." There is no allegation or evidence that any oral or written representations were made to McGann that the $1,000,000 coverage limit would never be lowered. Defendants broke no promise to [plaintiff]. The continued availability of the $1,000,000 limit was not a right to which McGann may have become entitled for the purposes of section 510.

*McGann,* 946 F.2d at 405. (Citations omitted; emphasis in original.)

Second, some courts focus on Congress' desire to grant employers a certain degree of flexibility in the design and modification of benefit plans so they can respond to changing economic circumstances:

> ERISA does not prohibit a company from terminating previously offered benefits that are neither vested nor accrued.... Instead, Congress intended employers to be free to create, modify, or terminate the terms and conditions of employee welfare benefit plans as inflation, changes in medical practice and technology, and the costs of treatment dictate.

*Owens,* 984 F.2d at 397–98. (Citations omitted.)

> "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits." To interpret "discrimination" broadly to include defendants' conduct would clearly conflict with Congress's intent that employers remain free to create, modify and terminate the terms and conditions of employee benefits plans without governmental interference.

\* \* \* \* \* \*

> "[I]n enacting ERISA, Congress continued its reliance on *voluntary* action by employers by granting substantial tax advantages for the creation of qualified retirement programs. Neither Congress nor the courts are involved in either the decision to establish a plan or in the decision concerning which benefits a plan should provide. In particular, courts have no authority to decide which benefits employers must confer upon their employees; these are decisions which are more appropriately influenced by forces in the marketplace and, when appropriate, by federal legislation."

*McGann,* 946 F.2d at 406–07, quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 91–93, 103 S.Ct. 2890, 2897, 77 L.Ed.2d 490 (1983) and *Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees,* 740 F.2d 454, 456 (6th Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

Third, some courts, including the 7th Circuit, rely on the notion that § 510 protects the employment relationship per se and does not prevent discrimination within the employment relationship via a plan amendment affecting the level of future benefits:

[i]t is clear from the text of the statute ... that § 510 was designed to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a pension right.... Simply put, § 510 was designed to protect the employment relationship which gives rise to an individual's pension rights.... This means that a fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way.

*McGath,* 7 F.3d at 668, quoting *Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir.1990); *see also, International Union,* 661 F.Supp. at 1302–1304. Indeed, based on this analysis the 7th Circuit went so far as to hold that a plan amendment could be purposely drafted to affect the benefits of only a single employee and still not be "discriminatory" for purposes of § 510.[2]  *Id.,* at 667–70.

### 3. Construction—employee discharges.

The Court focused on the plan amendment cases first in order to contrast their narrow interpretation of § 510 with the liberal interpretation accorded it by the majority of courts in cases involving employee discharges. While the former decisions allow an employer to amend a plan for the express

---

**2.** The 7th Circuit appears to go farther than other courts that have addressed the issue. Other courts leave open the possibility of a discrimination claim where the amendment at issue targets a specific employee. *See e.g., Owens,* 984 F.2d at 398 ("... section 510 relates to discriminatory conduct directed against *individuals;* it does not forbid discrimination relating to the plan in general."); *Aronson,* 730 F.2d at 16 ("This is not to say that a plan could not be discriminatorily modified, intentionally benefitting, or injuring, certain identified employees or a certain group of employees, but a partial termination cannot constitute discrimination per se."); *McGann,* 946 F.2d at 405–06.

**3.** *Kross* involved future health care benefits, for which ERISA provides no minimum vesting re-

purpose of preventing a vested employee from attaining certain unaccrued benefits, the latter courts, including the 7th Circuit, prohibit the employer from terminating that same employee for the same purpose. *See e.g., Kross v. Western Electric Co.,* 701 F.2d 1238 (7th Cir.1983); *Seaman v. Arvida Realty Sales,* 985 F.2d 543 (11th Cir.1993); *Conkwright v. Westinghouse Electric Corporation,* 933 F.2d 231 (4th Cir.1991); *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2d Cir. 1988); *contra, Baker v. Kaiser Aluminum & Chemical Corporation,* 608 F.Supp. 1315 (N.D.Cal.1984); *Corum v. Farm Credit Services,* 628 F.Supp. 707 (D.Minn.1986). The Court must give serious consideration and deference to the opinions of these courts, and particular attention and consideration must be given to the 7th Circuit's opinion in *Kross* which, if found to be controlling, may compel reversal of this Court's decision.[3]  The Court discusses below the various rationales offered by these courts on the issue and explains why it finds these rationales unpersuasive.

### a. Statutory language.

The statute prohibits firing an employee in order to interfere with his or her attainment of *"any right* to which such [employee] *may become entitled* under the plan."  29 U.S.C. § 1140.  (Emphasis supplied.)  In *Kross,* the 7th Circuit relied on this language in holding that § 510 is violated by the termination of a vested employee in order to avoid the payment of future medical and insurance benefits:

Our consideration of the scope of § 510 must begin, of course, with the language of the statute....  Section 510, read in its

---

quirements, and thus is not precisely on point. Having said this, the Court recognizes that nothing in *Kross* limits its application to health benefits. The Court believes, however, that the contradiction between the treatment of plan amendments and employee discharges under § 510, a contradiction which apparently was not argued or discussed before the 7th Circuit during its consideration of the issue, is the key to recognizing the error in extending § 510's protection to the unaccrued benefits of vested employees. Had this contradiction and corresponding analysis been brought to the 7th Circuit's attention, *Kross* may have been decided differently.  If not, the Court will stand corrected on appeal.

proper context, prohibits the discharge of an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled" under an employee benefit plan. Clearly, Congress would not have adopted such broad and encompassing language had it intended that § 510 be read as narrowly as the district court in the instant case has construed it.

*Kross,* 701 F.2d at 1242. (Citations omitted.) The 4th Circuit relied on the same language and reasoning in holding that § 510 protects vested employees who are terminated to avoid the accrual of additional pension benefits:

> Extending § 510 to encompass claims brought by vested employees for denial of additional benefits comports with both the legislative language and the intent of Congress to give employees "broad remedies" for violations of pension rights. Section 510 prohibits an employer from discharging an employee "for the purpose of interfering with the attainment of any right to which such participant may become entitled" under a benefit plan. Surely, Congress was not limiting § 510 only to those rights which a participant acquires upon vesting, or it easily could have referred to "vested rights." Similarly, the statute refers to rights to which a participant "may become entitled," which is to say that § 510 permits suits for interfering with rights not yet earned. We have no reason to construct this "broad remedial" provision to only vested rights when the Act clearly contemplates suits to protect any rights implicated by employer action.

*Conkwright,* 933 F.2d at 237. The effect of these holdings is to create two contrary interpretations of the phrase "any right" under § 510. One interpretation, found in plan amendment cases such as *McGann* and *Owens,* states that a specific benefit is not a "right" to which one "may become entitled" unless ERISA or the plan creates an existing, enforceable obligation. (See section 1(A)(2), *supra.*) The other interpretation, found in the employee discharge cases quoted above, essentially states that any unaccrued benefit qualifies as a "right" under § 510 simply because an employee "may become entitled" to that benefit at some point in the future. Both definitions cannot be right.

The latter interpretation does not give appropriate significance to the term "right". On its face, the term implies a claim or entitlement that is nonforfeitable, either by force of law or contractual agreement. It would thus be odd to categorize an unaccrued benefit as a "right" when, even in the 7th Circuit, that same benefit can be eliminated through a plan amendment without violating any section of ERISA.[4] The broader defini-

---

4. Of course, the 7th Circuit did not rest its decision upholding the validity of "discriminatory" plan amendments on the more narrow interpretation of the phrase "any right", as did *McGann* and *Owens.* Rather, as noted earlier, the 7th Circuit relied on the notion that § 510 is only triggered by a change in the employment relationship, not a change in the plan itself, quoting the often relied upon decision by the 6th Circuit in *West v. Butler,* 621 F.2d 240 (6th Cir.1980). *McGath,* 7 F.3d at 669. *West,* however, did not state that § 510 protects the employment relationship *for the sake of the employment relationship.* Rather, *West* held that § 510 protects the employment relationship *for the purpose of attaining vested pension benefits:*

> The legislative history reveals that the prohibitions were aimed primarily at preventing unscrupulous employers from discharging or harassing their employees *in order to keep them from obtaining vested pension rights.*

> \* \* \* \* \* \*

> (Senator Javits explained that § 510 would prevent an employer from arbitrarily discharg-

ing an employee *whose pension rights are about to vest* ). Thus, it appears Congress designed § 510 primarily to protect the employment relationship *that gives rise to an individual's pension rights.*

*West,* 621 F.2d at 245. (Citations omitted; emphasis supplied.) *Kross* and *McGath,* read together, seem to make job security the primary focus of § 510. As stated later in this opinion, ERISA is not a job security statute. ERISA protects pension rights, primarily by mandating minimum vesting and funding requirements. ERISA does not mandate early retirement benefits or any other specific pension or welfare benefit. Viewed from this perspective, it seems clear to this Court that § 510 protects job security only for the sake of vesting into a pension plan. Once an employee is fully vested, § 510 has served its purpose.

tion of the term also misses the proper interplay between the phrases "any right" and "may become entitled". *Kross* and *Conkwright* interpret the phrase "may become entitled" to imply that it is the "right" itself which may vest or adhere in the future. *See e.g., Conkwright,* 933 F.2d at 237 (". . . the statute refers to rights to which a participant "may become entitled," which is to say that § 510 permits suits for interfering with rights not yet earned.") In this Court's view, the better interpretation is that contained in *McGann,* where the "right" must be an "existing, enforceable obligation", such as a vested pension right or the statutory right to vest created by ERISA. *McGann,* 946 F.2d at 405. Under this interpretation, the phrase "may become entitled" refers to a participant's future eligibility to receive the benefits conferred by a present, nonforfeitable right, as in the case of pension payments which one becomes eligible to receive long after the "right" to such payments has vested. Indeed, the term "right" inherently implies a connection with the notion of "vesting" (one of the primary objectives of ERISA), because

vesting "refers to the nonforfeitable right of interest which an employee participant acquires in the pension fund." 3 U.S.C.C.A.N. 93rd Congress, Second Session, Legislative History, H.Rep. No. 90–533 at 4639, 4643–4646, S.Rep. No. 93–127 at 4838, 4844–4847.

■ Thus, the Court believes that *McGann* and *Owens* provide the most logical and supportable interpretation of the phrase "any right". Under that interpretation, a vested employee's unaccrued early retirement benefit does not constitute a right to which he or she may become entitled. That is, ERISA clearly does not mandate or confer a right to early retirement benefits. *See, Corum v. Farm Credit Services,* 628 F.Supp. 707, 717 (D.Minn.1986).[5] And Heath does not question MF's right to amend the Plan at any time or to eliminate the early retirement benefit altogether. In fact, MF eliminated the benefit for its more junior employees just two years prior to Heath's termination.

### b. The legislative history.

The courts which hold that § 510 protects the unaccrued benefits of vested employees

---

5. The cases relied upon by *Corum* base this conclusion on the fact that, under ERISA's vesting rules, only accrued benefits must be nonforfeitable. 29 U.S.C. § 1053(a); *Sutton v. Weirton Steel Division of National Steel Corporation,* 724 F.2d 406, 410 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984); *Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574, 577 (3rd Cir.1985); *McBarron v. S & T Industries, Inc.,* 771 F.2d 94, 99 (6th Cir.1985). ERISA defines an "accrued benefit" as an "annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23); *Sutton,* 724 F.2d at 410; *Bencivenga,* 763 F.2d at 577; *McBarron,* 771 F.2d at 99. Thus, "[t]he accrued benefits secured by ERISA do not encompass unfunded, contingent early retirement benefits or severance payments. The Act was not designed to prohibit modification of these ancillary benefits." *Sutton,* 724 F.2d at 410. This is also indicated by the legislative history:

The term "accrued benefit" refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits. . . . To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. . . . Also, the accrued benefit to which the vesting rules apply is not to include such items as the value of the right to receive benefits commencing at an age before normal retirement age. . . .

*Bencivenga,* 763 F.2d at 577, quoting H.R.Rep. No. 807, 93rd Cong., 2d Sess. 57, reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 4670, 4726.

*Bencivenga* also noted, however, that Congress amended ERISA in 1984, through the Retirement Equity Act ("REA"), "to include early retirement benefits within its accrued benefits protection. . . ." *Id.,* at fn. 3. The latter statement is not entirely accurate. The amended language and its subsequent interpretation make it clear that, when a plan is amended, early retirement benefits are only protected for those employees who meet the pre-amendment age and service requirements at the time of the proposed amendment or prior to their separation from service. *See e.g., Berger v. Edgewater Steel Company,* 911 F.2d 911, 918 (3rd Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Cattin v. General Motors Corporation,* 955 F.2d 416, 422–25 (6th Cir.1992); *Gillis v. Hoechst Celanese Corporation,* 818 F.Supp. 805, 810–11 (E.D.Pa.1992), *aff'd in part, vac'd in part,* 4 F.3d 1137 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994). If an employee is terminated prior to meeting these requirements, he has no right to early retirement benefits. *Id.* Thus, the REA did not create a "right" to early retirement benefits prior to their accrual.

also rely, for what it is worth, on ERISA's legislative history. This compels the Court, albeit reluctantly, to perform its own analysis of this history. Consulting legislative history to determine a legal issue under a statutory scheme as large and complex as ERISA is a hapless task. On the one hand are reams of materials dealing with the passage and development of ERISA in general, large enough in volume to merit their own separate library file in the WESTLAW database. On the other is a relative dearth of materials specifically discussing § 510 and the lack of any discussion whatsoever regarding the specific issue presented by this case.[6] Divining an unambiguous and definitive legislative intent under such circumstances is simply not possible, nor even advisable. "If one were to search for an interpretive technique that, on the whole, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history." *Conroy v. Aniskoff*, —— U.S. ——, ——, 113 S.Ct. 1562, 1567, 123 L.Ed.2d 229 (1993). Indeed, the references relied upon in the decisions considered here are good examples of the problem with legislative history. The references are little more than broad generalized statements regarding the overall purpose of ERISA and provide little guidance as to the meaning of § 510 in the precise context of the present dispute:

> The combined effect of our holding today and cases such as *McGann* is an interpretation of ERISA that prohibits employers from discharging employees to avoid paying benefits but permits employers to reduce or terminate non-vested benefits simply by changing the terms of the plan. This result may appear anomalous, but an examination of ERISA and its legislative history reveals that it is the result intended by Congress. ERISA's legislative history recognizes employers' need for flexibility in the design of benefits plans. ERISA therefore does not require employers to provide a retirement plan at all, or, when an employer chooses to provide ben-

efits, regulate the substantive content of welfare-benefit plans. On the other hand, ERISA provides that any participant or beneficiary may bring an action "to recover benefits due to him under the terms of his plan." This indicates that, once an employer decides to offer benefits, Congress intended for the employer to be bound by the terms of its plan.

*Seaman*, 985 F.2d at 546–47. (Citations omitted.)

> ... it is evident from the report of the House of Representatives' Committee on Education and Labor that Congress intended ERISA to remedy a broad range of problems in the field of employee benefit plans:

> "POLICY OF 'EMPLOYEE BENEFIT SECURITY ACT'

> "Underlying the provisions of this Act is a recognition of the necessity for a comprehensive legislative program dealing not only with malfeasance and maladministration in the plans, or the consequences of lack of adequate vesting, but also with the broad spectrum of questions such as adequacy of funding, plant shut downs and plan terminations, adequate communication to participants, and, in short, the establishment of certain minimum standards to which all private pension plans must conform if the private pension promise is to become real rather than illusory."

> \*    \*    \*    \*    \*    \*

> In light of the fact that ERISA is a remedial statute to be liberally construed in favor of employee benefit fund participants, we find no support for the district court's conclusion that since Kross "was already a participant in the insurance plans, he was not prevented from attaining rights under the plan."

*Kross*, 701 F.2d at 1242. The fact that ERISA is a comprehensive remedial statute and provides a private cause of action is a

---

**6.** When discussing the issue, the 4th Circuit noted that "[t]he conference committee on ERISA adopted § 510 without much discussion, except to make clear that 'the participant or beneficiary may bring a civil action against any person who interferes with his rights which are protected

under the Act.'" *Conkwright*, 933 F.2d at 236. This explanation, of course, is not very helpful, as it merely begs the question, discussed in the preceding section, of what exactly is meant by the term "right" in § 510.

fairly unconvincing basis upon which to find a cause of action under § 510 for vested employees who are terminated to avoid the accrual of future benefits. The same broad principles would also support a cause of action under § 510 for plan amendments that avoid the accrual of future benefits, but courts uniformly hold that no such cause of action exists. More importantly, these broad references contradict the few specific statements contained in the legislative history which actually discuss the purpose of § 510. The latter statements support the conclusion that § 510 was intended to protect the initial vesting of pension rights, not the accumulation of additional benefits once those rights are fully vested. For example, there is the oft-quoted statement of Senator Hartke on the matter:

Mr. President, I am talking about protection against improper job loss.

*No vesting formula will produce real employee protection so long as employers are free to fire employees to defeat pension eligibility.* Unfortunately, the Senate Labor Committee studies document many such occurrences. No statutory protection now exists to prevent such action.

I point out that most people start to work at the age of 18 and they will not become eligible until they reach the age of 30 under the provisions of the compromise bill. They have approximately 12 years of work before they become eligible.

\* \* \* \* \* \*

Most collective bargaining agreements protect employees against discharge without good cause and provide effective enforcement machinery in arbitration proceedings whose results are enforcible under section 301 of the Labor–Management Relations Act. But roughly half of all pension participants are not unionized and so they lack such protection. *Especially vulnerable are managers and executives whose substantial pension potentialities provide an incentive to their discharge before vesting.*

\* \* \* \* \* \*

*In recognition of that problem, section 610 of S. 4 [subsequently numbered 510 in*

*the final bill] as originally reported— made it illegal to "discharge, fine, suspend, expel, discipline or discriminate" against plan participants to defeat rights under the act or a plan. The language parallels section 8(a)(3) of the National Labor relations Act and should do the trick. . . .*

119 Cong.Rec. at 30374. (Emphasis supplied.) Senator Javits, in an exchange with Senators Hartke and Bentsen, also described the provision as preventing an employer from arbitrarily discharging an employee whose pension rights are about to vest:

Mr. HARTKE: I want to ask a very simple question: Does this bill provide, in fact, any benefits for a worker under 30 years of age?

Mr. BENTSEN: Of course, it provides some benefits for a man under 30 years of age.

Mr. HARTKE: Like what?

Mr. BENTSEN: If he had been working for a company 5 years, he would have received five years of credit toward vesting.

\* \* \* \* \* \*

Mr. JAVITS: Mr. President, will the Senator yield? We can answer these questions.

Mr. HARTKE: I think they can be answered, too, and I want the record to be correct on it.

Mr. BENTSEN: I said it would help in vesting and eligibility even if he is 30 years of age.

Mr. HARTKE: Talking about a person under 30 years of age, is there any vesting or other benefit under this bill whatsoever before he reaches 30?

Mr. BENTSEN: I am talking about the fact that it works toward his eligibility and vesting rights before he reaches 30 years of age.

Mr. HARTKE: Is there not a direct, positive incentive for every employer to fire a person when he reaches 29 years and 364 days of age?

\* \* \* \* \* \*

MR. JAVITS: The Senator has quite accurately answered the question of 30 years

and one's years of service and his qualification to come under the plan to vest, but, as he properly said—and that is a very important point—the prior service of every employee counts in respect of vesting. That is point one.

\* \* \* \* \* \*

Mr. HARTKE: Mr. President, will the Senator yield?

Mr. JAVITS: Not yet, no. I will answer all the Senator's questions.

*Finally, the Senator raised a question about a youth who would be fired just before his 30th birthday. The Senator from New Jersey (Mr. Williams) and I have included an express amendment on that score which would provide a remedy for any person fired such as is provided for a person discriminated against because of race or sex, for example.* That is section 699A, which states:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of the plan.

And so on.

So it seems to me we have made extraordinary reforms in precisely the areas to which the Senator refers.

119 Cong.Rec. at 30043–30044. (Emphasis supplied.) Lastly, Senator Williams also described the purpose of the statute as protecting the attainment "of vested benefits":

A further protection for employees is the prohibition against discharge, or other discriminatory conduct toward participants and beneficiaries *which is designed to interfere with attainment of vested benefits* or other rights under the bill, or to discourage the exercise of any rights afforded by the legislation.

*Conkwright,* 933 F.2d at 236, quoting 120 Cong.Rec. S 15,737 (Aug. 22 1974). (Emphasis supplied.) The 4th Circuit acknowledged that statements such as these demonstrate that § 510 primarily protects an employee's initial vesting into a retirement plan:

Viewed against this background, it has been recognized that the primary focus of

§ 510 is to "prevent[ ] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights."

*Id.,* at 237. (Citations omitted.) Even the U.S. Supreme Court, when discussing the unrelated issue of § 510's preemptive effect, noted the connection between § 510 and vesting:

By its terms § 510 protects plan participants from termination motivated by an employer's desire to prevent a pension from vesting.

*Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 143, 111 S.Ct. 478, 485, 112 L.Ed.2d 474 (1990).

■ Finally, even if the Court focuses on the overall purposes of ERISA, it is led to the conclusion that the protections of § 510 relate to the initial vesting of pension rights. As stated earlier, ERISA does not mandate employee benefit plans and does not dictate the substantive scope or content of any given plan. More to the point, ERISA does not mandate early retirement benefits. Congress had much more general concerns in mind. A review of the initial House and Senate Reports shows that Congress was concerned with addressing a few major issues relating to the security of employee pension rights. Those issues were vesting, funding, fiduciary responsibility and disclosure, reinsurance and portability. 3 U.S.C.C.A.N. 93rd Congress, Second Session, Legislative History, H.Rep. No. 90–533 at 4639, 4643–4646, S.Rep. No. 93–127 at 4844–4847. Of these various issues, "vesting" was one of the most important, as is shown by Senator Bentsen's remarks on the Senate floor:

One of the fundamental problems involves the loss of pensions by workers who leave their jobs after long periods of employment but before their earned pensions become vested because of unreasonable vesting requirements. Vesting occurs when an employee receives a nonforfeitable right to the money contributed to a pension plan on his behalf. Vesting may occur after an employee works for a company a specified number of years or after

an employee reaches a certain age and number of years in service. Different pension plans contain different vesting formulas but once an employee's pension rights are vested, the employee is entitled to receive his benefits at the normal retirement age even if he leaves the company before that time. Wherever an employee goes, he retains an absolute right to any vested benefits he may have earned.

Unfortunately, the system does not always work. There are too many examples in which employees, with many years of service with a company, have been denied absolutely all of their earned pension because they separated from their jobs just prior to fulfilling unreasonably stringent vesting requirements. They are left without a retirement income which they had confidently anticipated receiving, and on which they are dependent for decent survival.

120 Cong.Rec. at 29949. ERISA addresses this perceived problem. ERISA mandates certain minimum vesting requirements that every pension plan must satisfy and which ensure that long-term employees are 100% vested in their pension plans well before actual retirement. Thus, having set such minimum vesting requirements, it follows that Congress also wanted to prevent employers from avoiding these requirements by terminating employees who are close to vesting.[7] That is the most plausible explanation of § 510. It is the only explanation which is at once consistent with the language of the statute, the few specific statements in the legislative history discussing the statute, and the fundamental goals of ERISA in general.

### c. Policy implications.

The Court recognizes this decision may be characterized as providing less protection for senior employees than it does for junior employees. The 7th Circuit raised this concern in *Kross:*

> Moreover, adoption of the district court's position that § 510 of ERISA does not protect an employee who has already qualified for coverage under a company-provided insurance plan would lead to an anomalous result. Under the district court's restrictive view, § 510 would protect a probationary employee who had not yet qualified for a company-provided insurance plan from an improperly motivated discharge, while at the same time giving no protection to a more senior employee who had already qualified for participation in the insurance plan. There is no evidence that Congress intended ERISA to afford less protection to senior employees than that enjoyed by probationary or junior employees who have not qualified for coverage under particular employee benefit plans. Certainly, Congress did not enact ERISA with the intent to negate the long established practice of affording greater benefits and protections to those employees who have more seniority in time of service with the company than to junior employees.

*Id.,* at 1243. The 4th Circuit made the same observation:

> Not to give § 510 the reading we think it is due would result in giving vested employees, the most senior workers, less protection than that afforded junior workers. That is because an unvested worker discharged for the purpose of interfering with his not-yet-vested rights clearly can sue under § 510, .... but a worker who already has vested would be without legal recourse to protect his (additional) pension rights.

*Conkwright,* 933 F.2d at 237.

These concerns are not, the Court respectfully suggests, an accurate characterization of this Court's position. The decision the Court reaches today does not afford senior vested employees less protection than junior non-vested employees. To the contrary, it affords both groups of employees *the same* protection. Both groups are protected against being discharged in order to prevent

---

7. In contrast, Congress set no minimum requirements regarding early retirement benefits. Congress never even discussed early retirement benefits in connection with the development and passage of ERISA. It thus seems unlikely that Congress intended § 510 to preserve such benefits at all, much less for employees who are already fully vested in their retirement plans. Such employees, like Heath, have already received the protection ERISA created for them.

their becoming fully vested in their retirement plans. The difference is that senior vested employees have already gained the benefit of this protection, while junior nonvested employees have not. Moreover, neither group is guaranteed that their early retirement benefits (if any) will not be legitimately eliminated before they accrue. Both groups are vulnerable to a plan amendment or discharge eradicating any such benefit. In short, there is nothing "anomalous" about the Court's decision in this regard. What strikes the Court as anomalous is a result which says an employer can amend a retirement plan to prevent a specific vested employee from receiving a specific unaccrued benefit, but cannot terminate that same employee if termination accomplishes the same result. The latter rule proscribes the employer from discharging a vested employee to avoid accrual of a benefit which the employee has no enforceable right to receive and which, depending on what future changes the employer makes to the plan, he may never obtain a right to receive. Such a conclusion turns ERISA into a job security statute rather than a statute designed to create and protect vested pension benefits. If the benefit at issue can be eliminated through a plan amendment without violating ERISA, then the benefit can also be eliminated through an employee discharge. The ERISA claim is dismissed.[8]

## B. The ADEA Claim.

■ Heath also claims he was terminated because of his age in violation of the ADEA. His summary judgment materials are a bit confusing in this regard. At one point Heath seems to argue that his age discrimination claim can be established by evidence that MF terminated employees based on their pension status. Heath admits, as he must, that the U.S. Supreme Court recently held that an employer does not violate the ADEA by firing an employee based upon a motivating factor, such as pension status, which is merely correlative to age. *Hazen Paper Company v. Biggins*, ——

U.S. ——, —— - ——, 113 S.Ct. 1701, 1706–07, 123 L.Ed.2d 338 (1993). Heath relies, however, on the exception recognized in *Hazen* for cases where pension status is used as a "proxy" for age discrimination. *Id.*, —— U.S. at —— - ——, 113 S.Ct. at 1707–08. He claims this is such a case because under the 30 and Out program, unlike the retirement plan in *Hazen*, an employee could not possibly become eligible for early retirement without being in the protected age class (40 and above). The Court does not believe such evidence is sufficient to create a genuine issue of "proxy" discrimination under *Hazen*. To raise an issue for trial on proxy discrimination, Heath must create an issue of fact as to whether MF deliberately used the perfect correlation between its employees' pension status and their age as a shield to fire the older employees *because of their age*. The mere fact of a perfect correlation between pension status and the protected age group is insufficient to create a genuine issue of fact in this regard. Moreover, after Heath was fired, the two positions he asked to be transferred to were filled by new hires who were already receiving pensions from other companies and who were actually older than Heath. This indicates that pension status was not used as a mere proxy for age discrimination. Summary judgment is therefore granted as to any claim under *Hazen* for age discrimination by proxy.

■ At another point in his briefing, however, Heath articulates a more traditional theory of liability under the ADEA which does not rely on evidence of proxy discrimination. This theory follows the traditional burden-shifting analysis governing most claims of employment discrimination. "[A] terminated plaintiff's ultimate burden in an age discrimination case is to prove that he was discharged because of his age." *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988), citing *La Montagne v. American Convenience Prods., Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984). "The plaintiff need not prove that age was the sole factor motivating the em-

8. Given the Court's disposition of this issue, it is unnecessary to consider MF's additional argument that Heath failed to exhaust his administrative remedies. For the same reason, the Court also denies as moot plaintiff's provisional motion to amend the complaint to address the exhaustion issue.

ployer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age." *Id.* Where there is no direct or circumstantial evidence of age discrimination, the Court applies a burden-shifting analysis. *Id.* Under that analysis, "a plaintiff carries the initial burden of establishing a prima facie case of age discrimination." *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 462 (7th Cir.1986). In discharge cases, this requires the showing of four elements:

> In order to establish a prima facie case under the ADEA, a plaintiff must show (1) that he belongs to the protected class, (2) that his job performance was sufficient to meet his employer's legitimate expectations, (3) that he was discharged in spite of his performance, and (4) that the employer sought a replacement for him.

*Id.*

■ "A prima facie case is not a complete shield against summary judgment." *Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 608 (7th Cir.1984). Once a prima facie case is made, "the burden shifts to the [employer] to articulate a legitimate non-discriminatory reason for the discharge." *Dale*, 797 F.2d at 463. "This burden, however, is merely a burden of production, ... that is not difficult to satisfy." *Id.* "Once the defendant articulates a non-discriminatory, legitimate reason for its actions, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are pretextual." *Oxman*, 846 F.2d at 453. "The plaintiff can do so by showing either that a discriminatory reason more likely than not motivated the employer or that the employer's proffered explanation is incredible." *Id.*

■ Heath clearly puts forward a prima facie case of age discrimination. On January 10, 1991 Heath was 51 years old, he was performing his job satisfactorily, he was fired despite his job performance, and he was replaced by Plagman, a younger worker outside the protected age group. Discrimination is thus presumed and the burden shifts to MF to articulate a legitimate, non-discriminatory reason for termination. MF does

this through affidavits stating that Heath was terminated pursuant to a corporate reorganization in which his position was combined with Plagman's. The presumption thus dissolves and Heath must now create a genuine issue of fact as to whether MF's proffered reason is pretextual. Heath clearly does so through his own affidavit, the affidavits of former coworkers, and various corporate organization charts to the effect that Plagman merely assumed Heath's former duties and that other MF employees became responsible for Plagman's former duties. Viewing these submissions in a light most favorable to Heath, the Court cannot say that no reasonable jury could find MF's proffered reason a pretext for age discrimination. Summary judgment is therefore denied as to this claim, which is now the only claim remaining for trial.

**II. JURY TRIAL AND PUNITIVE DAMAGES**

■ Heath moved the Court for a jury trial and submission of a punitive damages question on the ERISA claim. This motion is moot by virtue of the Court's decision dismissing the ERISA claim. The only claim left for trial is the age discrimination claim, on which Heath is entitled to a jury trial but is not entitled to compensatory or punitive damages. 29 U.S.C. § 626(c)(2); *Espinueva v. Garrett*, 895 F.2d 1164 (7th Cir.1990), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 751. The Court also denies Heath's alternative request for submission of a punitive damages question on the grounds that it would "avoid the risk of a retrial if the issue of entitlement to punitive damages on the ERISA claim is appealed by either party." (Plaintiff's Provisional Motion to Amend at 5, fn. 4.) There can be no appeal of the jury issue at this stage because the Court is not deciding that issue. If the Court's decision dismissing the ERISA claim is appealed and reversed, a retrial is inevitable in any event.

**III. HEATH'S MOTION TO PRECLUDE TRIAL EXHIBITS**

Heath moved to preclude certain trial exhibits for MF's failure to produce these documents during discovery. The motion was

preliminarily granted by the Court, although MF was allowed an opportunity to respond. Based on MF"s response, the motion is now denied, but MF must provide Heath with copies of the documents within 5 business days of the date of this order. Failure to so produce any document precludes its use at trial. The only exception to this rule are the complaint and settlement documents regarding Lorraine Koch and Richard McDonough. Unlike the other documents at issue, these were the subject of a prior discovery request and were not produced. Thus, MF will be allowed to use these documents at trial (for impeachment purposes only), but must produce copies of the same even if it no longer wants to use them at trial.

## IV. COUNTER MOTIONS TO PRECLUDE WITNESSES

Both parties have moved to preclude various witnesses named by the other in their final pretrial reports. Some witnesses were never named prior to these reports and some were not produced for deposition on the grounds that they were not under the naming party's control. Both motions are denied on the following condition: Any witness not named or previously produced for discovery must be voluntarily produced for deposition within the time remaining before trial. Any witness not voluntarily produced by the naming party shall be excluded on the grounds that they were not named in a timely manner. This includes any witness not within that party's control, because if such a witness can be secured for trial, he or she can be secured for a voluntary deposition.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Defendant's motion for summary judgment is granted as to plaintiff's ERISA claim and as to any claim for age discrimination by proxy;

2. Defendant's motion for summary judgment is denied as to plaintiff's remaining claim(s) of age discrimination;

3. Plaintiff's motion for a jury trial and submission of a punitive damages question on the ERISA claim is denied as moot;

4. Plaintiff's motion to exclude certain trial exhibits is denied on the conditions contained in this Order;

5. Plaintiff's motion to preclude the testimony of certain witnesses is denied on the conditions contained in this Order;

6. Defendant's motion to preclude the testimony of certain witnesses is denied on the conditions contained in this Order;

7. Plaintiff's provisional motion to amend is denied as moot;

8. The final pre-trial conference, as indicated earlier, is rescheduled for 2:00 p.m. on October 26, 1994, via telephone.

**SO ORDERED.**

**UPON MOTION FOR RECONSIDERATION, THE FOLLOWING ORDER WAS ENTERED:**

This matter comes before the Court on plaintiff Allan T. Heath's ("Heath") motion to reconsider the Court's decision dated October 25, 1994. That decision dismissed Heath's ERISA claim and partially dismissed his ADEA claim. The facts are as stated in the Court's prior decision and are incorporated here by this reference. For the following reasons, the motion to reconsider is denied.

### ANALYSIS

### I. RIGHT TO AMEND

Heath concludes that, "[r]ead most fairly, the court's decision is premised on a conclusion that MF *retained the ability* to amend the Plan or to eliminate the early retirement option." (Heath's Brief in Support at 2; emphasis supplied.) Heath refers to the following language in the Court's decision:

... the Court believes that *McGann* and *Owens* provide the most logical and supportable interpretation of the phrase "any right". Under that interpretation, a vested employee's unaccrued early retirement benefit does not constitute a right to which he or she may become entitled. That is, ERISA clearly does not mandate or confer a right to early retirement benefits. *And Heath does not question MF's right to amend the Plan at any time* or to eliminate the early retirement benefit altogeth-

er. In fact, MF eliminated the benefit for its more junior employees just two years prior to Heath's termination.

(October 25, 1994 Decision at 1389–1390; citations omitted, emphasis supplied.) As is clear from the highlighted language, the Court's decision was premised (in part) upon an understanding that MF *had the right to amend the Plan*, not that it had *retained* the right or ability to do so. The distinction is important. Heath argues that the Plan documents in existence at the time of Heath's termination did not expressly and unambiguously retain the right to amend or terminate the Plan. At the very least, Heath argues, there is a genuine dispute as to whether the documents reserved such a right. Absent such a reservation, the right to amend did not exist, rendering the Court's decision invalid or, at best, premature.

■ The Court agrees that it is unclear whether any relevant plan document contained an express reservation of a right to amend. However, the Courts' decision was not premised on the existence of that right in such a clause. The Court's decision was based on MF's *statutory* right to amend the Plan. While Heath assumes that right only exists if the plan documents contain a provision affirmatively and unambiguously reserving that right, this is incorrect.[1] The right to amend is statutory in nature and therefore inherent in all employee benefit plans:

> Congress has conspicuously chosen to exempt welfare benefit plans from the full breadth of ERISA's extensive requirements.... Welfare benefits such as medical insurance, which may be ancillary to but are not part of a pension plan, are not subject to the rather strict vesting, accrual, participation, and minimum funding re-

quirements that ERISA imposes on pension plans. Accordingly, this Court and every other Circuit Court that has considered the question agree that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued."

\*     \*     \*     \*     \*     \*

> Since an employee's interest in such benefits is not statutorily vested, El Paso is under no continuing obligation to provide them under ERISA. It possesses the right to amend or terminate coverage at any time.

*Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 934–35 (5th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993). (Citations omitted.)

> It is well-established that ERISA does not prohibit a company from terminating or modifying previously offered benefits that are not vested. Although ERISA contains a strict vesting requirement for pension benefits, it expressly exempts employee welfare benefit plans from that requirement. Accordingly, a plan participant's interest in welfare benefits is not automatically vested, and employers have a statutory right to "amend the terms of the plan or terminate it entirely."

*Gable v. Sweetheart Cup Company, Inc.*, 35 F.3d 851, 854–55 (4th Cir.1994). (Citations omitted.)[2]

■ Because the right to amend is statutory in nature, the failure to expressly reserve the right in plan documents does not negate the existence of the right. Heath argues that if MF "did not reserve the right to amend or eliminate the "30 and Out"

---

1. It is true that the cases relied upon by the Court in this regard—*Owens* and *McGann*—cited the existence of such clauses, but only as evidence that the plans at issue did not themselves create a nonforfeitable right to certain unaccrued benefits. As explained later in this opinion, such a right, if found to exist, would fall within the doctrine of "contractual vesting" and would constitute a waiver of the statutory right to amend the plan. These cases do not, however, stand for the proposition that the right to amend does not exist unless it is expressly and unambiguously reserved in the plan documents.

2. The distinction drawn in *Wise* and *Gable* focuses on employee "welfare" benefits and it is unclear whether early retirement benefits provided in the context of a pension plan are properly categorized as "welfare" benefits. However, the reason there is a statutory right to amend or terminate employee "welfare" benefits is because they are not subject to ERISA's strict vesting requirements. Similarly, early retirement benefits, though they are "ancillary" to a pension plan, are not subject to ERISA's vesting requirements. (October 25, 1994 decision at 1389, fn. 5.)

benefit, it is stuck with the plan or the benefit permanently." (Heath's Reply Brief at 2.) In this Heath essentially posits a claim of "contractual vesting", a narrow doctrine recognizing that an employer may, within the terms of the plan itself, waive the statutory right to amend and assume a contractual obligation to maintain benefits at levels not mandated by ERISA. *Wise*, 986 F.2d at 937. It is established, however, that a plan document's silence as to any reserved right to amend is an insufficient basis for such a waiver. To the contrary, it is *the waiver* which must be clearly stated within the plan documents:

> We held above that although ERISA includes elaborate vesting requirements for pension plans ..., "it does not require that welfare plan benefits 'vest' or that an employer maintain them at a certain level." Although ERISA generally allows employers to modify or discontinue such plans at will so long as the procedure followed is consistent with the plan and the Act, we have held that an employer's welfare plan itself may designate a vested benefit. In Vasseur we stated: "An employer can oblige itself contractually to maintain benefits at a certain level in ways that are not mandated by ERISA."

> \* \* \* \* \* \*

> It follows that El Paso could have waived its statutory right to modify or terminate benefits and vested its workers contractually with the right to receive free lifetime coverage. We cannot find such an obligation, however, anywhere in the record in this case. Such extra-ERISA commitments must be found in the plan documents and must be stated in clear and express language. Neither the particular terms of El Paso's master policy nor its

pre–1985 SPD's come close to encompassing such a binding pledge.

\* \* \* \* \* \*

> ... we find no reason or authority to conclude that pre-1985 silence in the SPD's is somehow tantamount to an affirmative contractual commitment and that El Paso's earlier SPD's impliedly cede the right to later . amend or discontinue coverage. While clear and unambiguous statements in the summary plan description are binding, the same is not true of silence. There is nothing in the way of context, inference, or presumption to persuade us otherwise. Contractual vesting is a narrow doctrine. To prevail, Plaintiffs must assert strong prohibitory or granting language; mere silence is not of itself abrogation.

*Wise*, 986 F.2d at 937–38. (Citations omitted.)

> An employer may "waive[ ] its statutory right to modify or terminate benefits," however, by voluntarily undertaking an obligation to provide vested, unalterable benefits. Because such an obligation constitutes an extra-ERISA commitment, however, courts may not lightly infer the existence of an agreement to vest employee welfare benefits. Rather, in recognition of ERISA's requirement that employee benefit plans be governed by written plan documents filed with the Secretary of Labor, ... any participant's right to a fixed level of lifetime benefits must be "found in the plan documents and must be stated in clear and express language." Moreover, plaintiffs bear the burden of proving that their employer's ERISA plan contains a promise to provide vested benefits.

*Gable*, 35 F.3d at 855–56. (Citations omitted.) [3]

---

**3.** In both *Wise* and *Gable*, the underlying plans, as opposed to the summary plan descriptions, expressly reserved the employer's right to amend or terminate the plan. Neither court, however, based the existence of the right to amend on these reservations. Both courts described the right as preexisting and emanating from ERISA itself. However, while express reservations do not create the statutory right to amend, they can be important in determining whether the employer waived that right. For example, *Gable* held that such a reservation, "standing alone, is

more than sufficient to defeat plaintiffs' claim that the company provided vested benefits and thus waived its statutory right to modify or terminate the health care plan." *Gable*, 35 F.3d at 856. There is no waiver issue here, however. There is no clear and unambiguous statement in the plan documents concerning such a waiver. Silence cannot imply such a waiver. And the benefits language which conferred the "30 and Out" option, or the language which grandfathered Heath after the option was terminated,

Heath also argues that any right MF had to amend the Plan was unenforceable because MF failed to comply with certain of ERISA's procedural requirements, such as notice and proper disclosure. Specifically, MF: (1) failed to notify Heath that it could amend or terminate the Plan: (2) failed to provide Heath with copies of the plan documents, if any even existed: (3) failed to comply with 29 U.S.C. § 1022(a)(1), requiring plan descriptions to "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations": (4) failed to comply with 29 U.S.C. § 1022(b), requiring all plan descriptions to delineate those "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits": and (5) failed to comply with 29 U.S.C. § 1102(b)(3), requiring all plans to "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan".

▇ Some of the foregoing defects are expressly alleged and some are implied in several cases cited by Heath as standing for his general proposition that amendments or plan provisions tainted by violations of these requirements are unenforceable. (Heath's Brief in Support at fn. 7; Heath's Reply Brief at 2–3 and fn. 3.) Heath, however, misses an important distinction. Whether or

not an employer has the general power to do something, such as the power to amend a plan document, is distinct from the question of whether the use of that power in a specific situation will be upheld in light of certain other factors unrelated to the existence of the power itself. This case presents only the former issue, while Heath's argument and the cases he cites involve the latter.[4] That is, the Court only asks whether MF had the power to amend or terminate the Plan. It asks this only to determine whether Heath had a contractually vested right to early retirement benefits. The Court concludes he did not and thus such benefits are not protected by § 510. The case does not present the entirely different question of whether a specific amendment is enforceable against a specific employee or group of employees in light of certain alleged deficiencies in the plan documents or in the amendment process itself.[5]

## II. "UNVESTED" BENEFITS

Heath argues that the Court's decision was based upon the principle that "ERISA only protects an employee's initial vesting into a retirement plan" and upon the undisputed fact that Heath had already "fully vested" into MF's retirement plan. (Heath's Brief in Support at 10, quoting October 25, 1994 Decision at 1384–1385.) That is correct. Heath then argues that while he had fully vested

---

"cannot be translated into guarantees that benefits will never be altered". *Id.* at 857–58.

**4.** The latter issue also lies at the heart of the *Howe* and *Fox* cases, one reason why those cases are irrelevant here. Another reason is that *Howe* and *Fox* deal with different facts concerning a different type of benefit and a different type of plan participant. Heath relies on these two lawsuits, both of which involve ERISA claims against MF, in an attempt to have certain statements and factual findings made in those lawsuits binding here. But *Howe* and *Fox* deal only with the issue of altering *retiree's* welfare benefits, such as life insurance and health insurance, and only after they are retired. Evidence or findings concerning whether MF representatives promised retirees that such benefits were set in stone, or concerning whether MF was estopped from changing these benefits, is irrelevant to the question of whether incumbent employees had a nonforfeitable right to early retirement benefits.

**5.** Heath's argument in this regard draws the Court's attention to one sentence in its prior opinion which, in hindsight, may have been improvidently written. In concluding its analysis of the ERISA issues, the Court summed up its holding by stating that "[i]f the benefit at issue can be eliminated through a plan amendment without violating ERISA, then the benefit can also be eliminated through an employee discharge." (October 25, 1994 Decision at 1395.) This could be interpreted to mean that if an actual plan amendment would be unenforceable on procedural or notice grounds, a discharge is similarly unenforceable. This is not what the Court held. Again, the Court is here concerned with whether the power to amend existed, not with whether the use of that power in a specific instance would be proper or enforceable. Therefore, a more precise summation is that if an employer has the power to eliminate a benefit through plan amendments, it has the power to eliminate it through an employee discharge.

into the retirement plan, he had not yet "vested" into certain retirement welfare benefits, such as health and life insurance, because those benefits only "vest" upon retirement. Thus, Heath argues, "if vesting is the key to what ERISA does and does not prohibit in the context of an employee 'discharge', as the court found, its conclusion dismissing the ERISA claim is wrong for the independent reason that Heath was not vested in all components of "the plan" at the time of his discharge." (Heath's Brief in Support at 11–12.) This is incorrect.

The Court agrees that "vesting" is the key to what § 510 prohibits, but not as Heath explains it. The Court understands the word "vesting" as Congress understood it when it enacted ERISA. At that time, "vesting" was a topic of major concern. It referred to that point in time when an employee earned a nonforfeitable right to a pension regardless of how long he continued working for that employer. (See, October 25, 1994 Decision at 1392–1393.) Of course, the pension did not begin until the employee reached a certain age, and the amount of the pension depended upon how long he had worked with that employer, but the right to the pension could not be taken away. That was called "vesting". Congress perceived a problem in the area of "vesting" because many employees who left their jobs after long years of service had no pensions due to unreasonable vesting requirements. (Id.) They addressed this problem by mandating certain minimum vesting requirements, *only as to pensions*, which enable employees to "vest" into their pension plans at relatively early stages of their careers. Congress did not impose similar requirements regarding any other employee benefit. Thus, "vesting" is not simply a general reference to any point in time at which an employee becomes entitled to receive *any benefit*. Rather, when the Court stated that "ERISA only protects an employee's initial vesting into a retirement plan", it meant just that. To be more precise, it

meant that § 510 only protects that point in time at which an employee earns a nonforfeitable right to a pension regardless of how long he continues working for that employer. Section 510 does not protect the accrual of ancillary benefits in a pension plan. In the context of ERISA, such benefits simply do not "vest".[6]

## III. PROPRIETY OF SUMMARY JUDGMENT

Heath argues that summary judgment was improper because it was on a ground not raised by MF. MF certainly did raise the issue. MF argued that "[a] plaintiff must show more than a lost opportunity to accrue additional benefits to sustain a § 510 claim". (MF Brief in Support at 7.) MF then cited the only two cases (*Corum* and *Baker*) that have ruled as the Court ruled, *i.e.*, that § 510 protects an employee's initial vesting into a retirement plan and does not protect an employee's early retirement benefit. (Id.) Clearly this was enough to raise the issue. In fact, it was this argument and these cases which alerted the Court to the issue in the first place. While MF did not present the issue in all of its complexities and did not discuss the caselaw as deeply as the Court did, it nonetheless raised the issue.

Heath finally argues that summary judgment was premature because Heath has not had an opportunity to develop a record on the issue forming the basis of the Court's opinion, *i.e.*, whether MF expressly reserved the right to amend the Plan. As explained earlier, whether or not MF expressly reserved such a right is immaterial. The right was statutorily conferred and, because it was not expressly waived, the right existed at the time of Heath's discharge. As the Court stated before, the issue is basically a 12(b)(6) question. No further factual record is necessary.

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

---

6. Of course, § 510 does protect other benefits when they are nonforfeitable by virtue of the narrow doctrine of contractual vesting, discussed earlier. But this is not because ERISA or § 510 interprets the word "vesting" as applying to other types of benefits, but rather because a specific plan may choose to do so. Such would be an "extra-ERISA commitment" protected by § 510, not because it is a "vested" right under ERISA, but because it is a "vested" right under the terms of the plan and § 510 protects the attainment of any right provided by ERISA *or the plan*.

1.  Heath's motion to reconsider is denied.

**SO ORDERED.**